**Gene Autrey ADAMS, Plaintiff–Appellant,**

v.

**Paul METIVA, Defendant–Appellee.**

No. 93–1615.

United States Court of Appeals, Sixth Circuit.

Argued June 13, 1994.

Decided Aug. 1, 1994.

Lawrence D. Hochman (argued), Hugh M. Davis, Jr., Hugh M. Davis, Jr., P.C., Detroit, MI, for plaintiff-appellant.

Donald S. McGehee (argued and briefed), Office of the Atty. Gen. of Michigan, Lansing, MI, for defendant-appellee.

Before: MILBURN and BATCHELDER, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Plaintiff-appellant, Gene Autrey Adams, appeals the district court's grant of summary judgment to defendant-appellee, Paul Metiva, in this 42 U.S.C. § 1983 suit. For the following reasons, we reverse the judgment of the district court.

I.

This § 1983 suit arises from a traffic stop which escalated into a confrontation between plaintiff Adams, a passenger in a car which was stopped for emitting excessive fumes by defendant, police officer Paul Metiva.

Plaintiff, Gene Autrey Adams, is a black male truck driver, a freight hauler, from St. Louis, Missouri, who on June 27, 1991, dropped off a load from New Jersey in Ypsilanti, Michigan. He then went to a friend's

house, the home of the sister of Alvin Martindale. After working on Martindale's car, he fell asleep and was awakened by Martindale, who asked plaintiff to go with him to his estranged wife's house to pick up some video tapes. Plaintiff Adams agreed to go, was wearing a T-shirt, boxer shorts, had on no shoes or socks, and was not carrying his wallet. Plaintiff got in the car and alleges that he put his seat belt on. Martindale drove to his wife's house and plaintiff, the passenger in the car, fell asleep during the ride. Defendant Officer Metiva pulled the car over because it was emitting excessive fumes. Defendant's younger 20–year–old brother was a "ride along" passenger in the police car (police policy allows "ride alongs" who are interested in becoming policemen). After arresting Martindale, whom Metiva suspected was drunk, handcuffing him, and placing him in the police vehicle, defendant Metiva woke plaintiff up, ordered him out of the car, and asked him for identification. Defendant alleges plaintiff was not wearing a seat belt, but plaintiff alleges he was wearing a seat belt. Plaintiff was not carrying any identification and thus was unable to produce any identification. Plaintiff was twice subjected to a pat-down search by defendant in which plaintiff alleges he was roughed up. Defendant Metiva alleges that plaintiff Adams was drunk and disorderly and assaulted him after the second pat-down search. Two witnesses testified that it appeared that Metiva was harassing plaintiff, that plaintiff was not disorderly or violent, and that he did not touch Metiva. Plaintiff started to walk away from the car and was ordered to stop by defendant. When he kept on going, defendant sprayed mace in plaintiff's face. Plaintiff turned around to get back in the car, and defendant sprayed mace in his face again because he refused to lie down and be handcuffed. Plaintiff and two witnesses allege that defendant continued to spray mace in plaintiff's face after he was seated back in the car and was incapacitated. Defendant denies he sprayed mace in plaintiff's face after he had returned to the car.

Plaintiff was arrested and charged with assault on a police officer, resisting arrest, obstructing justice, and disorderly conduct.

A criminal trial was held on October 11, 1991. On October 16, 1991, plaintiff was acquitted by a jury of all charges. Plaintiff was issued a seat belt restraint violation and was notified of a hearing date, but failed to contest the citation or pay the fine.[1]

On May 21, 1992, plaintiff filed suit in the United States District Court for the Eastern District of Michigan. The complaint alleged violation of 42 U.S.C. § 1983 for the use of excessive force and unreasonable search and seizure in violation of the Fourth Amendment. Plaintiff alleged pendent state claims of malicious prosecution, false arrest and imprisonment, and assault and battery.

On January 29, 1993, defendant filed a motion for summary judgment, which the district court granted in an opinion and order of March 31, 1993. Plaintiff timely filed a notice of appeal.

## II.

Plaintiff first argues that the district court erred in granting defendant's motion for summary judgment in regard to whether an unreasonable seizure under the Fourth Amendment occurred.

### A. Standard of Review

▮ This court reviews an order granting summary judgment de novo. *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993). Summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court considering a motion for summary judgment must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in the light most favorable to the party opposing the motion. *Id.* at

---

1. Defendant contends that plaintiff "failed to contest" the seat belt citation and is now estopped from doing so. Plaintiff stated in his deposition that he believed his acquittal in the

criminal trial had resolved the alleged seat belt infraction. Plaintiff testified that his attorney for the criminal trial told him the seat belt citation had been taken care of.

323, 106 S.Ct. at 2553; *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *E.E.O.C. v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). The non-moving party may not rely on his pleadings alone, but must demonstrate the existence of a genuine issue for trial by pointing to "specific facts" that create such an issue. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356–57; *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. The judge may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

B. *Contested Facts*

A careful review of the transcript of the criminal trial, in which plaintiff was acquitted of resisting arrest, assaulting a police officer, obstructing justice, and disorderly conduct, reveals the following.[2]

Defendant Metiva testified that he decided to make a traffic stop on a vehicle because excessive fumes were coming from it and pulled the car over on Nancy Street, a high crime area where illegal drug transactions are not unusual. Defendant testified he arrested Martindale, the driver of the car, because he was unable to produce his license or proof of insurance and Metiva smelled alcohol on Martindale's breath. Metiva then handcuffed Martindale and placed him in the front seat of the patrol car for transportation to the station.[3] Defendant's "ride along" brother got in the back seat of the patrol car.

Metiva testified that he next approached the passenger side of the car to obtain identification from plaintiff Adams, who responded with vulgarities. Defendant testified he ordered plaintiff out of the car to conduct a pat-down search, but that plaintiff was fidgety so he was unable to perform a thorough pat-down. Defendant reiterated his request for identification and claimed that plaintiff responded by moving close to him and threatening him if he did not leave plaintiff alone. Defendant asked plaintiff to get back in the car and plaintiff complied.

Defendant returned to his police vehicle, requested assistance, and within a few minutes, Deputy Troy Bevier arrived. After explaining the situation to Deputy Bevier, defendant and Bevier approached the passenger side of the car to obtain identification from plaintiff, who again allegedly responded with vulgarities and refusal. Defendant asked plaintiff to get out of the car so he could perform a second pat-down search for weapons.

Defendant testified that while he was performing the second pat-down, plaintiff turned around, struck him in the chest with his right hand, knocked off his clip-on tie, and started to walk away. Defendant testified he ordered plaintiff to stop and told him he was under arrest. Defendant testified that when plaintiff did not stop, he sprayed plaintiff with mace in order to effect an arrest. While defendant was spraying the mace, he told plaintiff to lie on the ground so that defendant could handcuff him, but plaintiff refused. Defendant testified that he and Deputy Bevier "herded" plaintiff back to Martindale's car and plaintiff sat back down in the passenger seat. Defendant testified that several other officers arrived, including Trooper Bradley Breedveld, who went back to the car with defendant and helped him persuade plaintiff to get out of the car. Metiva then handcuffed plaintiff and transported him to the station in the patrol car.

Defendant's account of the events is essentially corroborated by the testimony of Deputy Sheriff Bevier, who testified that plaintiff responded to his request for identification with vulgarities and refused to give him any information. He testified that when plaintiff was ordered to get out of the car for a second pat-down search, defendant would not allow them to search him, pushed both officers away, and swung his left arm around, striking Trooper Metiva "in the upper region." Bevier testified that Metiva told

---

2. The entire transcript of the criminal trial was before the district court at the time of defendant's 1/29/93 motion for summary judgment.

3. Martindale was charged with drunk driving and his breathalizer test rendered a .15 blood alcohol content. He later pled guilty in state court to driving while impaired.

plaintiff that he was not to leave and was under arrest, and that when defendant refused to stop, Metiva sprayed plaintiff in the face with mace. Bevier testified that a crowd had gathered, people were yelling and screaming, and the crowd was getting very irate. He stated that when plaintiff got back into Martindale's car, Metiva did not continue to mace him.

Trooper Breedveld testified that when he arrived, plaintiff was sitting in Martindale's car and appeared to be very upset, accusing the police of being racist, that it was not fair to spray him with mace, that he was from out of state, and that they didn't treat blacks in such a manner where he came from.

In contrast to the officers' testimony, at his criminal trial plaintiff testified that he was a truck driver from St. Louis, Missouri, who delivered a load to Ypsilanti, Michigan, on the morning of June 27, 1991 after driving most of the night. He then went to the home of a friend where he drank two or three beers, worked on his friend Martindale's car, and fell asleep about 8:30 p.m. Plaintiff testified that Martindale woke him up and asked him to go with him to his wife's house on Nancy Street and that he fell asleep in the car after putting on his seat belt. He awoke when a police officer (Metiva) called him Spud, demanded identification, and ordered him to get out of the car. Plaintiff alleges that he got out of the car, told the officer that he had no identification, and that his name was Gene Autrey. He testified he put his hands on the car as ordered and submitted to a pat-down search. Plaintiff stated the officer was "getting rough with me," and that at this point plaintiff might have said "a few cuss words" because the officer was trying to rough him up, pushed him, and was carrying on.

Plaintiff testified he got back in the car and nodded off again when two officers approached the vehicle and wanted to search him again. Defendant testified that when he got out of the car, he asked the police, "[W]hats the problem, you know, have I, what have I done. You know, why you all harassing me. . . . By this time they never tell me I was under arrest so anyway I started across the street." Plaintiff testified

that he did not strike or have any physical contact with Officer Metiva. Plaintiff testified that he was cooperating with the officers and that the reason he left to go across the street was to make a phone call so that someone could come and pick him up. Plaintiff testified that Metiva was constantly getting violent, and that he didn't want to give Metiva any problems because plaintiff knew for a fact that getting locked up or having anything against his record would mean he would lose his job. He testified that no one ever told him he was under arrest, or that a crime had been committed, or that he was being charged with an offense so he thought it was okay to leave. He testified that while he was walking away, he wasn't really paying that much attention, when Metiva walked up and grabbed him from behind and ripped off his shirt. Plaintiff testified he asked defendant why he had torn his shirt off. Plaintiff stated, "About this time you know, I'm getting upset and I told them, you know, what have I done, you know. And he [Metiva] said you ever been sprayed with mace? I said no and I looked and he sprayed the mace in my face." Plaintiff testified that he had cooperated with Metiva until Metiva tore his shirt off and then he didn't want to have anything more to do with Officer Metiva because he believed he had done nothing wrong and was never told he was under arrest. Plaintiff testified that when Metiva told him to get on the ground to be handcuffed, he was afraid to do so because he figured the police were going to beat him. Plaintiff testified Metiva constantly sprayed him with mace, while calling him Spud. He testified Metiva told him to get back in the car and that he complied. Plaintiff stated at trial, "I couldn't see and my eyes, face, felt like it was on fire. And my eyes was running and I was gagging and stuff." Plaintiff testified that Metiva continued to spray him with mace while he was sitting in Martindale's car.

Plaintiff testified that when the other officers arrived, he complained to them that he had been sprayed with mace and that his shirt had been torn off of him. He stated that again no one ever told him he was under arrest or with what crime he was being

charged. He testified that the police walked him over to the police car and handcuffed him. In his deposition, plaintiff testified that he believed he was going to the police station to complain about the way he had been treated. He testified that he was told he had to be handcuffed to ride in the police car so he complied. He testified that Metiva put handcuffs on him and tightened them up so tightly that it cut off the circulation in his arms and that Metiva pushed him into the police car, threatening to beat him in the car. Plaintiff testified that no one ever alleged he was not wearing a seat belt at the scene of the incident. Plaintiff testified that at the police station, Metiva told him that whether plaintiff was wearing a seat belt or not, Metiva was going to give plaintiff a ticket for it. Adams Deposition, p. 116. Plaintiff stated that Metiva called him Spud (the name of the dog in the Budweiser beer commercial) throughout the incident and at the jail in order to humiliate him.

Plaintiff's account of his treatment by Metiva was corroborated by two disinterested witnesses, who did not know plaintiff. Darrell Sanderford testified that at the time the incident occurred, he was on his front porch on Nancy Street when the police pulled over a yellow Cadillac right in front of his house, which was at a distance from the street equal to the distance between the witness stand and the second row of seats in the courtroom. He testified that defendant Metiva spoke with plaintiff and that plaintiff got out of the car, was searched, and then got back in the car. Sanderford testified that after the back-up sheriff arrived, plaintiff got out of the car and was searched again. Sanderford testified that the police turned plaintiff around and had his hands on the hood on top of the car during the search. Sanderford testified, "I guess he was kind of like fed up, because they were like harassing him, you know, and he walks away from them." Sanderford testified that he never saw Adams hit either of the police officers and that he never took his eyes off of plaintiff so it was not possible for plaintiff to strike Metiva without Sanderford observing it. In regard to the spraying of mace, Sanderford testified:

Well the office[r] just pulled out a can of——a little thing of mace and started squirting him about five feet away from him. I mean constantly. He was going like this (witness indicating) ... and he's just constantly squirting him. I mean constantly.

. . . .

Well like I said he was, it was already in his face and he was trying to duck and dodge and he would be right here and he couldn't see. He's got his head down, you know, and he couldn't see and he put his hand up like this. The officer would jump to this side of him real fast and squirt him on this side of his face real fast. Ok, and after that happened for a few minutes they walked him back to the car, they put him in the car, ok and then he shakes the stuff up, like it was almost empty or something and just, literally just squirting him in his face. He couldn't go anywhere, he couldn't do nothing, he's in the car already. You know, and the guy is just squirting, just squirting.

Joint Appendix at 150–51, 153.

Sanderford testified that he never saw Adams walking toward either of the officers in a threatening manner, nor did he see anything about plaintiff that looked like he might be armed or dangerous. Sanderford testified that instead plaintiff:

just seemed like he just didn't want to be bothered and the officer took it upon himself to go these extra lengths.... [I]t was wrong for him to, you know, pursue the matter like that. It wasn't even necessary. There wasn't no loud cussing or I would be able to hear if it was loud. There was no loud discussions, there was nobody getting violent....

Joint Appendix at 153–54. Finally Sanderford testified that Adams did not act like a person who had been drinking.

The witness, Lee Clay, testified that he was sitting on Sanderford's front porch and saw plaintiff get out of the car and submit to a pat-down search. He stated that it seemed as if plaintiff was being harassed. He testified he saw plaintiff step out of the car a second time and walk around in front of the car when the officer yelled at him to stop. When plaintiff did not stop, the officer pulled

his shirt off him and sprayed plaintiff with mace as he was about to cross the street. Clay testified that he never saw plaintiff strike Metiva and that he never saw any violent act from plaintiff. He stated:

I saw Mr. Adams walking up to his friend's house. After he even got on the sidewalk he was sprayed again and as he couldn't see and he put his hands out in front of him so he, you know, he could lead himself around, you know, to try to stop the mace from coming at his face and he turned around to come back towards the car and he also was getting sprayed on his way back to the car. And then he proceeded back to his car, back around on the passenger side and got back in the car and shut the door. And he also got sprayed while he was sitting in the car.

Joint Appendix at 169. Clay testified that the spraying of mace lasted about six minutes.

This version of events was also corroborated by Alvin Martindale, the driver of the car, who was sitting in the police car. He stated that plaintiff "was not violent, but just like I said walking just like almost don't want to be bothered, that's the only thing." Martindale testified that his neighbors came up to him afterward and told him that they had seen what had happened and that "it wasn't right."

It is evident from this testimony at the criminal trial and the Adams and Martindale depositions that the following material facts are contested:

(1) whether plaintiff was wearing a seat belt.

(2) how plaintiff responded when defendant asked him for identification and asked him to get out of the car so defendant could perform the first pat-down search for weapons.

(3) whether plaintiff struck defendant in the chest, knocking off his clip-on tie, when ordered to get out of the car for a second pat-down search.

(4) whether defendant was told he was under arrest and then refused to stop.

(5) what precipitated the first spraying of mace in defendant's face outside the police car.

(6) why Metiva continued to spray mace in plaintiff's face after he turned around and was headed back to Martindale's car.

(7) whether defendant continued to spray plaintiff with mace after he returned to Martindale's car and was sitting inside it.

■ Throughout his opinion the district court disregarded the testimony of the two witnesses from the criminal trial, stating that "the trial court has at least some discretion to determine whether the respondent's claim is plausible," relying on *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Joint Appendix at 22. We disagree that *J.C. Bradford & Co.* applies in the present case. As the Ninth Circuit has stated, the trial court may only inquire into the plausibility of circumstantial evidence, and that when the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true. *McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir.1988); *See also T.W. Elect. Service, Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir.1987). We agree with the Ninth Circuit that the Supreme Court in *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, authorized "an inquiry on summary judgment into the 'implausibility' of inferences from circumstantial evidence, ... not an inquiry into the credibility of direct evidence." *McLaughlin*, 849 F.2d at 1207. In the present case, plaintiff has presented direct evidence in the form of witness Sanderford's and witness Clay's testimony, which contradicts the account of events provided by the police. For the purposes of a summary judgment motion, their accounts and all reasonable inferences drawn from it must be accepted as true. Thus, the district court erred in finding plaintiff's and the two witnesses' accounts implausible and in granting summary judgment where issues of credibility were determinative of the case at hand. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

## C. *Unreasonable Seizure*

Plaintiff does not contest the legality of the two *Terry* pat-down searches per se, but alleges he was unnecessarily roughed up during them. He contends that he was arrested without probable cause.

 An arrest must be predicated on probable cause that a crime has been committed. *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). In the district court's opinion, the court stated that for the sake of the summary judgment motion, it would construe the contested facts in a light most favorable to plaintiff and assume that plaintiff did not assault Metiva. However, the court was convinced that there was probable cause for defendant to arrest plaintiff because plaintiff was resisting arrest. We believe that the district court's reasoning is flawed, for if there was no reason to arrest defendant, there was no probable cause to arrest him for resisting arrest. Deputy Sheriff Bevier testified that under Michigan law, one cannot be arrested for a civil infraction, such as failure to wear a seat belt.[4]

 In the present case, it is contested whether plaintiff was acting in a drunken, disorderly manner and threatened and then assaulted Metiva as the two police officers allege, or whether plaintiff walked away after being subjected to two pat-down searches in which he was roughed up and had his shirt torn off him even though he committed no violent or threatening actions. We believe these contested issues of material facts are determinative of whether there was probable cause to arrest defendant, and the district court erred in stating in its opinion that even if plaintiff did not assault Metiva, there was probable cause for arrest because plaintiff

did not stop when ordered to do so by the police and plaintiff refused to lie down on the ground and be handcuffed. Plaintiff alleges that he was wearing his seat belt, that although he asked the police what he had done, he was never informed they wanted to write him a ticket for a seat belt infraction, that he was never told he was under arrest, that he was afraid to lie down and be handcuffed because he would be beaten, that he merely wanted to cross the street to make a phone call, and that he informed the police of his intention. If this account is accepted as true as must be done on a summary judgment motion, *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, there would be no lawful reason to further detain plaintiff after the second pat-down search because no weapons were found on him. Because the test for whether a seizure has occurred is whether a reasonable person would feel free to leave, *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), if there is no reason to further detain a person, he cannot lawfully be detained against his will. In other words, in the present case, if there was no reason to detain plaintiff further, probable cause did not exist to arrest him for attempting to leave or for refusing to lie down and be handcuffed.[5]

 It is contested whether plaintiff refused to get out of the car, refused to tell defendant his name, refused to allow a full *Terry* pat-down search, and then walked away after being told he was under arrest. If plaintiff was wearing his seat belt as he alleges and did not assault Officer Metiva or act in a drunken and disorderly manner, there would be no further reason to detain him even though he was unable to provide

---

4. Officer Bevier testified that a seat belt violation was a civil infraction and a person can't be arrested and jailed for a civil infraction under Michigan law. He also testified that under Michigan law, there is no requirement that a passenger in a car carry identification. (Joint Appendix at 93–94).

5. Defendant asserts there were grounds for arrest because plaintiff admitted he cussed at Officer Metiva and was unable to produce any identification. Plaintiff stated he may have uttered "a few cuss words," but also stated that Metiva called him Spud, roughed him up, tore the shirt

off his back, and maced him for no valid reason. In light of these alleged circumstances, plaintiff's behavior would not provide grounds for probable cause to arrest. There is absolutely nothing wrong in plaintiff's inability to produce identification as the passenger of a car is not required to carry identification. Although M.C.L. § 750.103 states that "any person ... who shall profanely curse or damn or swear by the name of God, Jesus Christ or the Holy Ghost, shall be guilty of a misdemeanor," the police did not allege that plaintiff cursed or swore in the name of God, but instead said he used vulgar language.

identification. In other words, plaintiff was not resisting a lawful order to stop if there was no probable cause to arrest him or further detain him *before* he was ordered to stop. It is uncontested that plaintiff disregarded Metiva's order to stop. Whether the order was a lawful one depends on whether there was probable cause to arrest plaintiff for assaulting Metiva or for acting disorderly or for refusing to provide information for a seat belt citation, or whether Metiva was using the alleged seat belt citation as a pretext for harassing plaintiff, roughing him up during two pat-down searches, calling him a humiliating name, in general treating him like an animal (as Martindale alleged), and refusing to tell him what he had done wrong, which is what plaintiff alleges. In the police report of the incident, Metiva wrote that plaintiff stated that the police "just wanted to beat up on 'niggers.'" Joint Appendix at 344. Whether this is true is for the jury to decide. Because whether plaintiff was resisting a lawful arrest depends on credibility determinations, the determinations are for the jury, not the court, to make. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

To conclude, because there are material issues of contested facts in regard to whether the arrest of plaintiff was based on probable cause, the district court erred in granting defendant's motion for summary judgment and is reversed on this issue.

### III.

We must next decide whether the district court erred in granting defendant's motion for summary judgment in regard to the use of excessive force.

The district court's opinion stated that plaintiff failed to produce any evidence that suggests that it was objectively unreasonable for defendant to use mace in order to effect an arrest. We disagree. First, as discussed previously, whether the arrest was a lawful seizure depends on contested issues of material facts. But even if it were reasonable to spray plaintiff with mace in order to get him to stop when he refused to stop, there are still contested facts in regard to whether the use of force was excessive.

Plaintiff and witnesses Clay and Sanderford testified that Metiva continued to spray plaintiff with mace after the mace had gotten in plaintiff's eyes, he was groping around, had turned around, and was heading back (or was being "herded" back) to Martindale's car. Plaintiff and both witnesses testified that Metiva continued to spray mace in plaintiff's face even after he was seated in the car, could not see, and was incapacitated. In spite of this testimony, the district court stated the following:

> Lastly, the Court is not persuaded that Plaintiff's testimony, corroborated by one witness,[6] that Defendant continued to spray mace at Plaintiff once Plaintiff had re-entered the vehicle changes the instant result. Defendant employed the mace in order to aid him in subduing Plaintiff so that Defendant could handcuff him. Although Plaintiff had re-entered the vehicle, he had still failed to follow Defendant's direction to submit to being handcuffed and, therefore, Defendant was entitled to continue to attempt to effect the lawful arrest. Plaintiff admits that he failed to obey Defendant's command to get on the ground and submit to being handcuffed. . . .

Joint Appendix at 32.

 Upon a motion for summary judgment, the district court is not to make credibility determinations or weigh the evidence, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513–14, and must consider the facts in the light most favorable to plaintiff. In the present case, however, the district court's version of the facts is not the most favorable to plaintiff and is not supported by the evidence. The district court found that even if defendant continued to spray plaintiff with mace once he was in the car, this use of force would be reasonable because plaintiff would not lie down on the ground to be handcuffed, and since he was

---

**6.** The district court is in error. Plaintiff's testimony was corroborated by two disinterested witnesses.

not handcuffed when he entered the car, it was necessary to spray mace on him to get the handcuffs on and effect the arrest. To the contrary, Metiva denied spraying mace on plaintiff once he reentered the car and did not state that plaintiff resisted being handcuffed or was violent once he was back inside the car. There is absolutely no evidence to support the district court's hypothesis that it was necessary to mace plaintiff once he returned to the car because he was unruly or refused to be handcuffed. Plaintiff and both witnesses testified that he could not see, was groping around, and had his hands up in front of his face. If all inferences are construed in favor of plaintiff, once he was back in the car he was incapacitated and blinded, yet continued to be sprayed with mace. It is for the jury, not the court, to decide whose version of events to believe in regard to whether Metiva continued to mace plaintiff once he was back in the car. The district court first erred by discounting the witnesses' accounts and then by adopting a version of events which favors defendant and is not supported by the evidence.

In regard to whether this macing of plaintiff would constitute excessive force, in *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989), the United States Supreme Court held that all excessive force claims should be considered under the Fourth Amendment standard. The standard is one of objective reasonableness under the circumstances. *Id.* at 396–97, 109 S.Ct. at 1871–72. In *Pleasant v. Zamieski*, 895 F.2d 272, 276 (6th Cir.), *cert. denied*, 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990), this court stated that when reviewing excessive force claims under 42 U.S.C. § 1983:

> the "proper application" of this reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

(citations omitted). This court in *Zamieski* emphasized that the standard is an objective one without regard to the officers' underlying intent or motivation. *Id.* at 276.

In the present case, if the contested facts are construed in the light most favorable to plaintiff, the severity of the alleged "crime" at issue was either no infraction or, at most, a seat belt infraction, a failure to stop after twice submitting to a pat-down search for weapons in which plaintiff allegedly was roughed up, and a failure to lie down on the ground to be handcuffed. Although defendant alleges plaintiff assaulted him, the two witnesses testified that plaintiff was not acting violently and never touched defendant. Plaintiff alleges that he was wearing his seat belt, indicating that there was no reason to obtain identification from him and that the seat belt infraction was used as a pretext for the treatment he received. It is for the jury to decide which version of the contested facts to believe in order to determine whether it was reasonable to use mace in order to get plaintiff to stop.

In regard to the second factor, if no assault occurred and plaintiff was not acting in a threatening or violent manner as plaintiff and two witnesses allege, plaintiff did not pose an immediate threat to the police officers. In regard to the third factor, whether plaintiff was actively resisting arrest or attempting to evade arrest is contested as plaintiff alleges he was never told he was under arrest or why he was being further detained after submitting to two pat-down searches. Moreover, plaintiff's alleged flight was an announced walking to his friend's house across the street. Defendant relies on *People v. Suchodolski*, 22 Mich.App. 389, 178 N.W.2d 524 (1970) for the proposition that an officer need not inform a suspect he is under arrest if the suspect flees or forcibly resists before the officer has time to inform him. In the present case, there was ample time for Metiva to inform plaintiff that he wanted to cite plaintiff for a seat belt infraction, and that if he had no identification, he had to provide Metiva with the necessary information and could not leave until he did so.

If all inferences from contested facts regarding the *Zamieski* factors are drawn in favor of plaintiff, the alleged seat belt citation was a pretext for Metiva's demand for identi-

fication, Metiva called plaintiff a demeaning name and then subjected plaintiff to two pat-down searches, roughing him up in order to show off for his "ride along" brother looking on from the police car. It is for the jury to decide if the events should be interpreted in this light and whether it was necessary to mace plaintiff at all.[7]

Moreover, even if all the facts are not construed in plaintiff's favor and plaintiff pushed or struck Metiva as alleged by the police, there is still a contested issue of material fact in regard to whether spraying mace in defendant's face after he returned to the car constituted excessive force. The district court found that such force would have been reasonable because plaintiff admitted that he failed to obey defendant's command to get on the ground and submit to being handcuffed. Plaintiff argues that this order was superseded by Metiva's demand that he return to Martindale's car. Metiva testified he "herded" defendant back into Martindale's car and never alleged that it was necessary to spray mace in plaintiff's face so that he could handcuff him once he was back in the car. Given the effects of mace, which usually is blinding and incapacitating, in this instance, the district court, instead of construing the facts in a light most favorable to plaintiff, hypothesized and drew inferences in defendant's favor, inferences which contradict the account of the two witnesses and of defendant himself. We find that if the jury determines that plaintiff's version of events is true, this action would constitute excessive force as a matter of law. *See McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir.1988). To conclude, because there are contested issues of material facts, the district court's grant of summary judgment to defendant in regard to the use of excessive force is hereby reversed.

### IV.

Next, we must decide whether qualified immunity shields defendant from section 1983 liability.

"To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati,* 953 F.2d 1036, 1042 (6th Cir.1992). Government officials, who perform discretionary functions, are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *See Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The key inquiry in analyzing a claim of qualified immunity is whether the defendant's alleged conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 638–40, 107 S.Ct. at 3038–39; *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Birrell v. Brown,* 867 F.2d 956, 958 (6th Cir.1989). The burden is on the plaintiff to allege and prove that the defendant official violated a clearly established constitutional right. *Tucker v. Callahan,* 867 F.2d 909, 913–14 n. 3 (6th Cir.1989).

In *Russo v. City of Cincinnati,* 953 F.2d at 1043, this court indicated that when a motion for summary judgment is brought claiming qualified immunity, a plaintiff must effectively pass two hurdles. First, the allegations must state a claim of the violation of clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed the acts that violated the law. Both are questions of law for the court to decide.

In the present case, both the right to be free from unreasonable seizures, *California v. Hodari,* 499 U.S. 621, 624–25, 111 S.Ct.

---

**7.** Defendant relies on the Martindale deposition to argue that plaintiff was acting like a wild animal. However, Martindale explained what he meant by saying, "You have like a group of people trying to trap a wild animal." When asked if Mr. Adams was the wild animal, he replied, "I didn't mean to say like a wild animal, but like a animal and you, all surrounding it and it don't want to be touched or whatever just walking and just calm, but not cooperating I guess," corroborating the other two witnesses account that defendant was not acting violently, but seemed as if he just didn't want to be bothered any longer.

1547, 1549–50, 113 L.Ed.2d 690 (1991), and to be free from the use of excessive force under the Fourth Amendment, *Graham,* 490 U.S. at 392–93, 109 S.Ct. at 1869–70, are clearly established. The issue is thus whether plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what Officer Metiva allegedly did was objectively unreasonable in light of these clearly established constitutional rights. We believe that plaintiff has met this burden.

 It is the province of the jury, not the court, to decide on the credibility of the defendant's account of the need for force. As this court stated in *Brandenburg v. Cureton,* 882 F.2d 211, 215–16 (6th Cir.1989):

This circuit has noted that the question is whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." Although this is purely a legal question to be decided by the court, a court may not be able to make a determination if the exact character of the "actions" that *Anderson* requires the court to consider is unknown.

This court ultimately decides the law to be applied. In this case, however, the jury becomes the final arbiter of [defendant-]appellant Sharp's claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury. If the jury determines that Sharp fired on Brandenburg without a belief that someone was in danger of serious bodily injury, then as a legal matter no reasonable officer could believe that such gunfire would not violate another's constitutional rights. On the other hand, if the jury believes detective Sharp's version of the facts, he will be entitled to qualified immunity.

(citations omitted).

The same is true in the present case. The legal question of immunity is completely dependent upon which view of the facts is accepted by the jury. As this court in *Holt v. Artis,* 843 F.2d 242, 246 (6th Cir.1988) stated, "[I]f the defendants arrested the plaintiff without probable cause, or subjected him to more force than was reasonably necessary under the circumstances, then they are liable for his injuries. What they believed is not at issue, and they cannot have acted in good faith." Because there are contested issues of material facts in regard to Metiva's actions in arresting plaintiff and the use of force, the jury must decide these issues in regard to qualified immunity. If the jury determines that Metiva arrested plaintiff without probable cause and gratuitously maced a helpless and incapacitated person, then as a legal matter no reasonable officer would believe that such conduct would not violate plaintiff's constitutional rights. Thus, in the present case, the district court erred in determining that Metiva subjectively could have believed he was acting within constitutional limits and thus was entitled to qualified immunity.

 As discussed previously, plaintiff has presented sufficient evidence to create genuine issues in regard to whether defendant arrested plaintiff without probable cause and then used excessive force, which are both objectively unreasonable actions in light of clearly established law. A reasonable person would know that creating a pretext of a seat belt violation in order to harass the passenger of a car and refusing to allow the passenger to leave after two pat-down searches revealed no weapons would violate the right to be free from unreasonable seizures. A reasonable person would know that spraying mace on a blinded and incapacitated person sitting in a car would violate the right to be free from excessive force. Because defendant's alleged conduct would violate clearly established constitutional rights of which a reasonable person would know, and plaintiff's version of events is supported by sufficient evidence, the district court erred in granting defendant's motion for summary judgment on qualified immunity grounds. *Hall v. Ryan,* 957 F.2d 402, 404 (7th Cir.1992) (defendants cannot prevail at the summary judgment stage if plaintiff can present a version of the facts that is supported by the evidence and under which defendants would not be entitled to qualified immunity).

## V.

We must finally decide whether the district court erred in granting summary judgment in regard to plaintiff's state law claims.

Count two of plaintiff's complaint alleged the following state law tort claims: false arrest, false imprisonment, assault and battery, and malicious prosecution. Defendant first contends that plaintiff's state law claims fail because the Michigan Governmental Immunity Act, M.C.L.A. § 691.1407, immunizes his conduct since plaintiff has failed to establish that defendant was grossly negligent in effecting the arrest.

■ The Michigan Governmental Immunity Act provides that an officer and employee of a governmental agency is immune from tort liability for injuries to persons or damages to property caused by the officer while in the course of employment if the following are met:

> (a) The officer ... is acting or reasonably believes he or she is acting within the scope of his or her authority.
>
> ....
>
> (c) The officer's ... conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, 'gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

M.C.L.A. § 691.1407(2).

■ In the present case, even if defendant reasonably believed he was acting in the scope of his employment when he arrested plaintiff, we believe there is a question whether defendant was grossly negligent in effecting the arrest. The district court stated that it was not convinced that defendant's actions constituted gross negligence, i.e. were "so reckless as to demonstrate a lack of concern for whether an injury results." We disagree. It is for the jury to decide whether Metiva sprayed mace in the face of a blinded and incapacitated person, and whether this was a grossly negligent action, demonstrating lack of concern for whether an injury would result. Therefore, under Michigan law, defendant does not have governmental immunity.

Defendant claims that even assuming *arguendo* that governmental immunity did not shield defendant from liability, plaintiff has failed to make out prima facie claims of false arrest, false imprisonment, and malicious prosecution.[8]

■ In order to prevail on a claim of false arrest and false imprisonment, a plaintiff must show that his arrest was not legal, i.e., without probable cause. *Brewer v. Perrin*, 132 Mich.App. 520, 527, 349 N.W.2d 198 (1984) (citing *Lewis v. Farmer Jack Division, Inc.*, 415 Mich. 212, 218 n. 2, 327 N.W.2d 893 (1982)). Whether or not a plaintiff could actually have been convicted of the charges is irrelevant because actual innocence is not an element of the tort of false arrest. As previously discussed, there are contested issues of material facts in regard to the legality of plaintiff's arrest, precluding a grant of summary judgment to defendant on these state law claims.

■ To establish a prima facie claim of malicious prosecution under Michigan law, a plaintiff must show: (1) that a criminal prosecution was instituted against plaintiff by defendant and was terminated in plaintiff's favor; (2) absence of probable cause for the criminal proceeding; and (3) malice or a primary purpose in bringing the action other than bringing the offender to justice. *Coogan v. City of Wixom*, 820 F.2d 170, 172 (6th Cir.1987).

■ Plaintiff contends defendant intentionally lied in his incident report in order to procure a criminal proceeding against him which defendant knew was not supported by probable cause. If substantiated, this assertion would provide the basis for a malicious prosecution. *King v. Arbic*, 159 Mich.App. 452, 406 N.W.2d 852 (1987) (upholding dismissal of malicious prosecution claim because no evidence in record indicating that defendant knowingly included false facts in his incident report without which the prosecutor could not have concluded there was probable cause). In the present case, it is contested whether defendant, the prosecuting witness, made a full and fair disclosure of material facts in his incident report. *Belt v. Ritter*, 18 Mich.App. 495, 503, 171 N.W.2d 581 (1969) (the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to

---

**8.** Defendant concedes that plaintiff makes out a prima facie case of assault and battery.

false facts in a complaint, without which there is no probable cause), *aff'd by*, 385 Mich. 402, 189 N.W.2d 221 (1971). In the present case, there is evidence in the record—the testimony of witnesses Sanderford and Clay—that defendant did not act violently and never struck Metiva, which gives rise to the possible inference that defendant Metiva knowingly included false facts in his incident report without which the prosecutor could not have concluded there was probable cause for prosecution. The allegation that defendant acted with malice may be inferred from lack of probable cause. Rest. Torts 2d, Section 669. It is for the jury to decide if defendant made a full and fair disclosure in his incident report. For this reason, plaintiff has alleged a prima facie case of malicious prosecution.

For these reasons, the district court's grant of summary judgment in regard to plaintiff's state law claims is hereby reversed.

## VI.

To conclude, the judgment of the district court is hereby REVERSED. A grant of summary judgment is not proper where, as here, issues of credibility are determinative of the case at hand.