NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0036n.06
Filed: January 10, 2007

No. 05-2689

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CLINTON RIVER CRUISE CO., | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner-Appellant,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| NATHANIEL C. DELACRUZ, II, as | ) | |
| Personal Representative of the Estate of | ) | |
| Rafael C. DeLaCruz, II, Deceased, | ) | O P I N I O N |
| | ) | |
| *Claimant-Appellee.* | ) | |

BEFORE: COLE, MCKEAGUE, Circuit Judges; BREEN, District Judge.[*]

J. DANIEL BREEN, District Judge. Petitioner-Appellant, Clinton River Cruise Co. ("Clinton"), appeals the district court's order denying its motion for summary judgment and granting summary judgment in favor of the Claimant-Appellee, Nathaniel C. DeLaCruz, II, as Personal Representative of the Estate of Rafael C. DeLaCruz, II, Deceased. The Appellant maintains the district court's ruling on its motion for summary judgment was in error. We **REVERSE**.

## I. BACKGROUND

### A. Facts

---

[*]The Honorable J. Daniel Breen, United States District Judge for the Western District of Tennessee, sitting by designation.

1

On June 3, 2002, Rafael DeLaCruz was a passenger on a vessel owned by the Appellant, the M/V CLINTON FRIENDSHIP, described as a 1984, 64-foot, steel hull motor vessel. It had two open-air decks, was capable of carrying 149 passengers, and contained a bar, food concessions and facilities for lunch and dinner cruises. Cruises were conducted along the Clinton River in Mt. Clemens, Michigan.

The United States Coast Guard ("USCG") performed annual inspections on the M/V CLINTON FRIENDSHIP and its Certificate of Inspection for the vessel required that it be manned by a captain and two deckhands. On the date of the incident from which the suit arose, William Hart, the holder of a USCG captain's license since 1980 and a British yachtsman's license since the mid-1990s, was acting as master of the vessel. There were also two crewmembers aboard--Carl Saad and Susan Bremer--along with Carol DeLaura, who worked as a bartender.

The M/V CLINTON FRIENDSHIP was chartered on June 3, 2002 by a local entertainer for the purpose of entertaining a group of persons, many of whom knew one another. DeLaCruz, a 26-year-old student, was in attendance along with some of his friends. The decedent was described as a good athlete and a marathon runner who had military training. The ship left the dock on the Clinton River at around 7:30 p.m. with approximately 40 passengers. Saad was working on the upper deck and Bremer on the lower level. After a trip downriver and into Lake St. Clair, the vessel was returning to its berth when DeLaCruz and others gathered at the stern. As it passed Markley's Marina at a distance of some 50 feet, DeLaCruz and another passenger, Aaron Mough, undressed, handed their shoes, wallets, cell phones and other items to a friend with instructions to pick them up on shore and dove off the vessel in an apparent race to land. Confident of their friend's athletic

prowess, DeLaCruz's companions were unconcerned and returned to their dancing and socializing, not bothering to alert the crew.

As she was emptying trash, Bremer overheard some of the passengers talking about the men going overboard and, looking over the stern, spotted them swimming away from the boat toward the marina. She alerted the captain, who handed the helm to Saad and ordered the vessel to circle back in an attempt to retrieve them. Bremer also assessed the effectiveness of throwing life rings into the water but decided against it, as the men were purposefully swimming away from the boat and out of range of the life rings. Mough arrived at the marina but DeLaCruz drowned. It is undisputed that DeLaCruz was not intoxicated by Michigan's legal standards and that he jumped into the water voluntarily.

### B.    Prior Litigation

On August 18, 2003, Clinton filed a complaint for exoneration from or limitation of liability pursuant to 28 U.S.C. § 1333. The estate of Rafael DeLaCruz filed a claim in the district court action. Both parties moved for summary judgment. In its motion, Clinton sought exoneration from liability on the grounds that the decedent's own actions were the sole proximate cause of his death or, in the alternative, limitation of liability due to the shipowner's lack of privity and knowledge of negligence on the part of its employees. The district court held Clinton negligent per se based on its alleged violation of the vessel's Certificate of Inspection manning requirement. The district court granted summary judgment in favor of DeLaCruz and denied the motion for summary judgment filed by Clinton. On October 28, 2003, the district court entered judgment against Clinton. This appeal followed.[1]

---

[1]The court notes that the parties have filed post-argument briefs, to which exhibits have been attached for the court's consideration. While the court permits such supplementation, it concludes,

3

## II. ANALYSIS

### A. Standard of Review

This court reviews a district court's grant or denial of a motion for summary judgment de novo. Alkire v. Irving, 330 F.3d 802, 809 (6th Cir. 2003); Miller v. Am. Heavy Lift Shipping, 231 F.3d 242, 246 (6th Cir. 2000). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharm., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552. The "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

### B. Discussion

The Limitation of Liability Act, 46 U.S.C. app. § 183, allows the owner of a vessel to limit its liability for a maritime accident under certain conditions. See In re Muer, 146 F.3d 410, 414 (6th

---

in light of the decision rendered herein, that the evidence proffered is merely cumulative.

Cir. 1998), cert. denied, 525 U.S. 1103, 119 S. Ct. 867, 142 L. Ed. 2d 769 (1999). A limitation action requires the court to engage in a two-step analysis: (1) the ship's negligence or unseaworthiness, and (2) the shipowner's privity or knowledge of the negligence. Id. at 416.

> Under the Limitation Act, a ship owner is entitled to exoneration if he, his vessel, and crew are found to be completely free of fault. Even if not completely free of fault, the ship owner is entitled to limitation of liability if the ship owner had no knowledge or privity to the ship's negligence or unseaworthiness. The burden of proving negligence lies on the person claiming to be injured, but once negligence is established, the vessel's owner must prove lack of knowledge or privity to the negligence.

Id. (citing In re Cleveland Tankers, Inc., 67 F.3d 1200 (6th Cir. 1995), cert. denied, 517 U.S. 1220, 116 S. Ct. 1848, 134 L. Ed. 2d 949 (1996)).

The district court granted DeLaCruz's motion for summary judgment on the grounds that Clinton was negligent per se. The district court based its conclusion on Clinton's violation of the manning statute, codified at 46 U.S.C. § 8101(a), which provides that "[t]he certificate of inspection issued to a vessel . . . shall state the complement of licensed individuals and crew . . . considered by the Secretary to be necessary for safe operation." "A vessel [to which § 8101 applies] may not be operated without having in its service the complement required in the certificate of inspection." 46 U.S.C. § 8101(d). The certificate of inspection issued by the USCG on April 30, 2001 with respect to the M/V CLINTON FRIENDSHIP required that the vessel be manned by two deckhands. The district court ruled as a matter of law that Saad was a deckhand but Bremer was not. Therefore, the M/V CLINTON FRIENDSHIP violated the statutory requirement to have two deckhands aboard, triggering the district court's application of the Pennsylvania doctrine which "holds that when a statutory rule intended to prevent an admiralty accident exists and a party violates that statute injuring a party whom the statute was created to protect, the violating party, to avoid liability, must show that

5

its violation could not have been the cause of the accident." See Pearce v. United States, 261 F.3d 643, 648 (6th Cir. 2001) (citing The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L. Ed. 148 (1873)) (emphasis omitted).

As the district court itself acknowledged, there is no statutory definition of a deckhand. In Navigation and Vessel Inspection Circular No. 1-91, however, the USCG articulated general guidelines for recommended qualifications and training topics for small passenger vessel deckhands. The circular states that "[t]he Marine employer is responsible for ensuring that an individual engaged as a deckhand on a small passenger vessel: (1) [m]eets the company's minimum physical requirements; (2) [i]s familiar with the location of emergency/navigation equipment and procedures; and (3) [h]as demonstrated the ability to respond to emergency situations." Of particular importance in this case, the circular further provides that "[a]t the discretion of the Officer in Charge, Marine Inspection (OCMI), some or all of the deckhands may be permitted to perform duties such as concessionaires, waiters or waitresses provided that they can readily respond to their regularly assigned deckhand duties. However, cooks and foodhandlers should not normally be accepted as deckhands, because of their employment status and good health practices." The circular recommends that deckhands be familiar with, among other things, man overboard procedures, including the "[l]ocation and use of lifesaving equipment[,] [t]he vessel's maneuvering characteristics[,] [e]mergency communications skills[,] [p]roper recovery procedures . . . rigging and line handling."

The district court based its determination as to the number of deckhands onboard the M/V CLINTON FRIENDSHIP on June 3, 2002 on the deposition testimony of Saad and Bremer. In his deposition, Saad identified himself as a "deckhand." He received no training or certification from the USCG, but was trained on the job in "[t]ying the boat up when we approach the dock, when we leave

the dock, how to recognize who has the right of way, things like that, proper speeds and tactics while driving the boat, I guess proper care of passengers on the boat, making sure everyone's okay, things like that . . . [b]eing able to tell if someone was feeling seasick or having trouble with the water or nervous, things like that because they hadn't ridden a boat before." He also testified as follows:

Q:      What about -- am I correct if I say that your duties as a deckhand were pretty much relegated to navigation of the vessel?

A:      No, but yes, that is true, but also like a busboy type thing or waiter--not so much waiter, we don't do that, things like that. There's the boat responsibilities, then there's customer responsibilities like a restaurant.

Q:      So tell me about those responsibilities.

A:      Restaurant responsibilities?

Q:      Yes.

A:      Bussing tables, clearing empty glasses, bottles, picking up plates, organizing, straightening chairs, make sure things aren't in the way.

\*      \*      \*

Q:      How many levels are on this boat?

A:      Two.

Q:      And where would you commonly be?

A:      Depending on the amount of people on the cruise or the type of cruise it is, kind of depends.

Q:      Give me some different circumstances.

A:      A normal lunch cruise I might be serving, working the buffet line for a little while then other times kind of filtering through the boat, top and the bottom. If you mean this particular cruise, for the most part I was on the top deck.

\*      \*      \*

Q:      . . . And what would you be doing on the top deck?

7

A:      Clearing, bussing and monitoring.

In her deposition, Bremer testified that she worked as "crew" and that there were no job titles. In response to a specific question concerning whether she considered herself a deckhand, she again replied "I'm crew, that's what we call ourselves." Bremer described her duties on the M/V CLINTON FRIENDSHIP by stating that "Well, I kind of run the boat, make sure everything's in order, food's in order, people get on and off and make sure I have my other crew with me. . . . I can bartend at times, depends on where they need me." She, like Saad, did not have a USCG certification, but had received training in man overboard procedures prior to the incident. Bremer also engaged in line handling, but not on the evening of June 3, 2002. That night, she "arrived and cleaned the boat, [got] ice, [got] pop, ice[d] things up, [made] sure we [had] the paper products, help[ed] people boarding, then we [left] the dock, then I walk[ed] around and [made] sure everything's okay." She was "selling pizza or slices of pizza and just selling it and providing pizza on plates and napkins [and] cleaning up afterwards."

The following colloquy also appears in Bremer's deposition:

Q:      So your duties from the time you boarded, basically you've told us on that particular night is to do the pizza station and throw garbage away, stuff like that?

A:      Uh-huh.

Q:      No deckhand-type duties?

A:      Not that night, no.

Q:      What do you recognize to be deckhand-type duties?

A:      Handling the lines, staying with the captain, checking with the captain periodically.

Q:      Okay.

A:      Making sure no one's hanging over the side of the boat.

Q:      Who was working deckhand duties that night?

A:      Carl [Saad].

This portion of Bremer's testimony, along with her statements that she was "crew" and Saad's identification of himself as a deckhand, rendered it "apparent to the [district court] that there was only one deckhand on board the Clinton Friendship on the night of June 3, 2002."

Subsequent to the taking of deposition testimony, Clinton submitted the supplemental affidavit of Paul Gallas, Clinton's principal owner, who averred as follows:

Despite how Ms. Bremer classified herself, she was serving as a deckhand on the date of the incident.

That on the CLINTON FRIENDSHIP, crew members are assigned to each deck with the primary crew man being assigned to the top deck and the number two crew man being assigned to the first deck. The number one crew man is responsible for handling the lines when departing and entering a dock and in lowering the mast when the vessel is going under a bridge.

Apart from these responsibilities, the number one and number two crew members on the vessel have the same responsibilities which include:

Acting as a lookout; keeping an eye on the passengers; standing by the wheel; making periodic rounds around the vessel; assist in the loading of supplies onto the vessel prior to a cruise; insuring that the vessel is properly clean both before and after a cruise; helping passengers board the vessel; connecting and/or disconnecting shore power to the vessel; providing any necessary assistance to outside entertainers serving on the vessel[;] insuring that the vessel has an adequate supply of potable water before the vessel leaves the dock and then to properly pump out any sewage at the end of the cruise. The second crew member will also help raise and/or lower the mast when necessary.

Bremer also provided an affidavit following her deposition, stating that

There are at least two crew members assigned to the vessel on each cruise, with one individual being designated as the number one crew man. During my tenure on the CLINTON FRIENDSHIP, I have worked as both the number one and number two crew member on the vessel.

9

The crew members on the CLINTON FRIENDSHIP during each cruise have essentially the same duties which include, among other items:

> To act as a lookout when needed; to keep an eye on the passengers; to help raise and lower the mast when going under bridges; to make periodic rounds around the vessel; to load the vessel prior to each cruise to insure that the proper supplies are on the vessel for the cruise; to clean the vessel both prior to and subsequent to the cruise; to connect and/or disconnect shore power to the vessel when it is either leaving the dock or arriving at the dock; to assist passengers in boarding the vessel; to stand by the wheel when necessary[;] insuring that the vessel has an adequate supple [sic] of potable water before the vessel leaves the dock and then to properly pump out any sewage at the end of the cruise.

The number one crew man also has the responsibility for handling the lines when either arriving at or departing a dock.

I performed all of the duties outlined [in the paragraph above enumerating duties of crew members] on the night of June [3] in addition to those duties which were delineated in my deposition of January 28, 2004.

The district court rejected the affidavits on the grounds that both contradicted Bremer's earlier deposition testimony, which it concluded clearly demonstrated the presence of only one deckhand--Saad.

In Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir. 1986), this court set forth the general rule that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his or] her earlier deposition testimony." In dismissing the affidavits, the trial court in this case cited to a subsequent unpublished decision from this Circuit, Lockard v. General Motors Corp., 52 F.App'x 782 (6th Cir. 2002). However, in a recent published opinion, the Sixth Circuit has criticized Lockard as an unwarranted expansion of the rule articulated in Reid. Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 907 (6th Cir. 2006), reh'g denied (Jun. 20, 2006). In Aerel, this court noted that

> the court in Lockard appears to have recast one of the policy justifications underlying the Reid rule--that a party's ample opportunity during discovery to present evidence provides courts with reason to prevent that party from introducing new evidence in an affidavit opposing summary judgment--as an independent ground for striking portions of an affidavit.

Id. (citing Lockard) (internal quotation marks omitted). The court further explained that

the expansive view of the Reid rule adopted in [Lockard] is unwarranted. The rule set forth in Reid is grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists. Reid and its progeny have thus barred the nonmoving party from avoiding summary judgment by simply filing an affidavit that directly contradicts that party's previous testimony.

This is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage. Because the deponent is under no obligation to volunteer information not fairly sought by the questioner, we have no reason to apply Reid and its progeny to such a situation.

Id. We emphasized in Aerel the importance of distinguishing between "legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact." Id. at 908; see also Briggs v. Potter, 463 F.3d 507, 513 (6th Cir. 2006) (based on Aerel's narrow definition of "contradiction," court found that "[w]hile Briggs was questioned generally about that June 2001 conversation, he was not expressly asked what Pickard had said to him during that conversation. As Briggs was under no obligation to volunteer everything Pickard said during that conversation, he should not be prevented from providing greater detail in a later affidavit."); Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 43 (2d Cir. 2000) (a later sworn statement may be considered if it is not in fact contradictory or where it "addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition"). One factor the court may consider in determining whether a later affidavit should be stricken is "whether the earlier testimony reflects confusion that the affidavit attempts to explain." Aerel, 448 F.3d at 908-09.

In this case, based on a reading of the depositions and the affidavits in their entirety, the affidavits are not contradictory, but, rather, offer a more complete explanation of Bremer's duties. The affidavits also seek to rectify possible confusion arising from Bremer's use of the term "crew

11

member" instead of "deckhand." Therefore, they should have been taken into account by the district court. See id. at 907. The district court's exclusion of the affidavits based on Lockard was in error. In addition, the district court's ruling, in focusing essentially on one statement from each of Saad's and Bremer's depositions as to whether they were deckhands, while completely discounting the remainder, constitutes an assessment of credibility and weighing of evidence not permitted at the summary judgment stage. See Adams, 31 F.3d at 379. Summary judgment is only "mandated where the facts and the law will reasonably support only one conclusion." McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356, 111 S. Ct. 807, 818, 112 L. Ed. 2d 866 (1991). Therefore, as there was a genuine issue of material fact as to whether Bremer was a deckhand, the district court's conclusion that Clinton violated the manning statute as a matter of law by having only one deckhand onboard was in error. Moreover, because of the district court's determination, the premature application of the Pennsylvania rule was also in error. See Pearce, 261 F.3d at 648 (Pennsylvania rule requires a statutory violation). It follows that the district court's award of summary judgment to DeLaCruz on his negligence claim must be vacated.

As stated above, the district court in a limitation action is charged with a two-step inquiry: (1) negligence or unseaworthiness; and (2) the owner's privity or knowledge of the negligence. See In re Muer, 146 F.3d at 416. The district court in this case denied Clinton's motion for summary judgment on the grounds that it failed to establish lack of privity or knowledge of negligence based on its awareness that the M/V CLINTON FRIENDSHIP had only one deckhand. As there is an issue of fact as to Bremer's status, the district court's denial of Clinton's motion for summary judgment was appropriate. We note, however, that the district court's conclusion regarding Clinton's privity or knowledge is undermined by our determination above that the court unfairly truncated the material

12

factual record. If, on remand, the question of fact regarding Clinton's negligence is ultimately resolved against Clinton, then the matter of Clinton's privity or knowledge will have to be revisited with reference to the entire record.

Clinton additionally argues that the district court erred in failing to apportion fault between the appellant and DeLaCruz. However, this issue, along with the other issues held in abeyance by the district judge,[2] will need to be addressed by the district court on remand.[3]

### III. CONCLUSION

Based on the foregoing, the district court's award of summary judgment in favor of claimant DeLaCruz is **VACATED**. The district court's denial of Clinton's motion for summary judgment, however, is **AFFIRMED**, albeit on grounds other than those relied on by the district court. The case is **REMANDED** to the district court for further proceedings consistent with this opinion.

---

[2]In an order entered March 6, 2006, the district judge held in abeyance pending the outcome of the instant appeal (1) Clinton's motion for clarification that the district court's order denying its motion for summary judgment did not preclude a finding that the decedent was contributorily negligent in causing his own death and (2) the motion of DeLaCruz to reopen the case, lift monitions and injunctions and to proceed with the limitation of liability proceeding.

[3]Although Clinton appears to invite the court to find that, regardless of the number of deckhands on board, it is entitled to summary judgment on the grounds that DeLaCruz was as a matter of law the sole proximate cause of his own demise, the court declines to do so. Instead, this question too is one to be determined by the trial court on remand.