Charles H. THOMPSON, Sr.

v.

**WILLIAMSON COUNTY, TENNESSEE, et al.**

No. 3:96–0263.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 17, 1997.

Charles R. Ray, Nashville, TN, for Plaintiff.

Lisa M. Carson, Franklin, TN, for Defendant.

## MEMORANDUM

CAMPBELL, District Judge.

Pending before the Court is Defendant's Motion for Summary Judgment (Docket No. 11). For the reasons stated herein, Defendant's Motion is GRANTED in part and DENIED in part.

Plaintiff is the father and administrator of the Estate of Charles H. Thompson, Jr., deceased. Defendant Kenneth G. Gooding was, at all times material hereto, a deputy sheriff for Defendant Williamson County, Tennessee.

Plaintiff seeks compensatory and punitive damages against Defendants for violations of constitutional rights under 42 U.S.C. § 1983 ("Section 1983"); for violations of 42 U.S.C. § 12132 ("the Americans with Disabilities Act"); for violations of 29 U.S.C. § 794 ("the Rehabilitation Act"); and for the state law claims of wrongful death, assault and battery, outrageous conduct and negligence or gross negligence. Complaint (Docket No. 1), ¶¶ 9–14. Defendants have moved for summary judgment on all claims.

## FACTS

On July 5, 1995, the Williamson County Emergency Response Unit received a 911

call from someone at the Thompson residence at 7187 Brush Creek Road, Fairview, Tennessee. Complaint, ¶ 4.

Plaintiff alleges that the 911 caller requested emergency medical assistance for Charles H. Thompson, Jr. (hereafter "the Deceased"), who was "having an episode of aberrational maniacal and possibly threatening behavior towards members of the household by brandishing two machetes." Complaint, ¶ 4. The portions of the 911 call which were transcribed, apparently by the Tennessee Bureau of Investigation (*see* Affidavit of William Jorgensen (Docket No. 16), ¶ 3 and attached transcription), indicate that the following initial exchange took place:

> Voice: my brother he's he's kinda mentally handicapped and he's just flipped his wig
>
> Dispatcher: what do you need the police department out there or an ambulance or
>
> Voice: no we need them out here
>
> Dispatcher: Who police department
>
> Voice: yes
>
> \* \* \*
>
> Robin [the Deceased's brother] No he wants he wants to use it on my dad because my dad told him ask him to give him the knife back he he tried to hang himself when he was little and he's not all there in the head

*Id.*

Although the transcript indicates that the caller said the Deceased might use the machete on his father, both Mr. and Mrs. Thompson testified that they did not feel threatened by the Deceased. Deposition of Odessa Thompson (Ex. 6 to Docket No. 13), p. 17 (had no concern that he would harm her) and Deposition of Charles H. Thompson, Sr. (Docket No. 17), p. 16 ("wasn't worried about that one bit").

It is undisputed that Defendant Gooding was the first officer to arrive at the Thompson home in response to the 911 call and that Sgt. Paul Brady arrived thereafter. The parties dispute just what information was given to the officers by the family at that time.

Plaintiff asserts that the officers were fully informed of the Deceased's mental problems and of a previous episode in 1993, when the Fairview Police responded and took the Deceased to receive medical treatment. Charles H. Thompson, Sr. Affidavit (Docket No. 22), ¶ 6. Mrs. Thompson testified she told the officers the Deceased "was mental, and he had the mind of a child." O. Thompson Deposition (Ex. 6 to Docket No. 13), p. 20.

Defendant Gooding denies that he was informed of the similar episode in 1993 [Deposition of Kenneth G. Gooding (Ex. 2 to Docket No. 13), pp. 63 and 119], although Sgt Brady testified that he "could have" been told about that episode on the initial visit with the Thompsons. Deposition of Paul Elmer Brady (Ex. 3 to Docket No. 20), pp. 22 and 29.

Plaintiff contends he "informed Deputy Gooding that I did not want Charles Thompson, Jr. harmed, but rather, wanted him taken to the Williamson County Medical Center to receive medical attention and treatment." C. Thompson Affidavit (Docket No. 22), ¶ 6.

Defendants contend that the Thompson family advised Defendant Gooding that "they would prosecute," "they were going to seek warrants" against the Deceased. Gooding Deposition (Ex. 2 to Docket No. 13), pp. 69–70, 77; Affidavit of Kenneth G. Gooding (Docket No. 26), ¶ 4.

On the other hand, Mr. Thompson stated: "We told them we would not" sign warrants. C. Thompson Deposition (Docket No. 17), pp. 20–21.[1] Plaintiff insists: "We told them we did not want him put in jail, we did not want him hurt, we wanted him carried to Williamson County Medical Center for treatment." *Id.,* p. 18. Mrs. Thompson testified that she told the officers she did not want to sign a warrant for the Deceased's arrest: "I didn't want him locked up, if I had to I would to get him to the hospital." O. Thompson Deposition (Ex. 6 to Docket No. 13), p. 22.

---

1. In fact, Mr. Thompson testified that Defendant Gooding "kept insisting that we take a warrant out for Charles" and "we kept explaining to him that ain't what we wanted." C. Thompson Deposition, p. 21.

Because the Deceased had left the house and could not be found on the property at that time, the officers left the area. Gooding Deposition (Ex. 2 to Docket No. 13), pp. 77–78; Gooding Affidavit (Docket No. 26), ¶4. Shortly thereafter, the 911 dispatcher received another call from a member of the Thompson family, again requesting help and informing the dispatcher that the Deceased had returned and was in the backyard with two machetes. Complaint, ¶6; Affidavit of William Jorgensen (Docket No. 16), attached transcript.

In this second conversation, Mrs. Odessa Thompson gave the following information to the dispatcher, according to the transcript provided by Defendants:

Dispatcher: Mam do you want him arrested

Mom: Yes we just want somebody to get here (unintelligible)

Dispatcher: Yes they want him arrested

Mom: He needs to be in central state or somewhere

Mom: See he's he's crazy I mean he's mental

* * *

Dispatcher: Mam has he ever been diagnosed with a mental disorder

Mom: He is mental

Dispatcher: I know that but has a doctor

Mom: Yes(?)

Dispatcher: OK what did they diagnose him with (voices)

Mom: He's mental he's on Depakote and ? something ? I can't pronounce it He goes to the counseling

Dispatcher: Quantitin or Clonopin

Mom: Yes that's it

Dispatcher: Clonopin

* * *

Dispatcher: OK but you don't know the name of what he was diagnosed as like manic depressive or

Mom: He had a brain damage when he was fourteen he stayed in a coma

*Id.*

It is undisputed that Defendant Gooding received a second 911 dispatch with regard to the Deceased and returned to the Thompson home. It is also undisputed that, at the time Defendant Gooding arrived, the Deceased was in the backyard with two machetes. Defendant Gooding testified that, upon arriving at the Thompson property the second time, when he exited his vehicle, he retrieved his shotgun, racked it and placed a shell in the chamber. Gooding Deposition (Ex. 2 to Docket No. 13), pp. 46 and 59.

It is undisputed that Defendant Gooding was told, by the Deceased's brother, that the Deceased was "out back." Defendant Gooding testified that he looked around the side of the house and saw the Deceased sitting on a swing or a chair, holding a machete in each hand. Gooding Deposition (Ex. 2 to Docket No. 13), pp. 85–86; Gooding Affidavit (Docket No. 26), ¶6.

The parties dispute what exactly happened after Defendant Gooding saw the Deceased in the backyard. Defendants contend that Defendant Gooding identified himself as a police officer and repeatedly advised the Deceased to drop the machetes. Gooding Deposition (Ex. 2 to Docket No. 13), pp. 88–89, 91, 115; Gooding Affidavit (Docket No. 26), ¶7.

Plaintiff contends that Defendant Gooding said "Drop it" only once before killing the Deceased. Deposition of Fannie Mai Pewitt (Ex. 3 to Docket No. 13), p. 11; and Deposition of Cecil Pewitt (Ex. 4 to Docket No. 13), pp. 8–9.

Whatever was said, it is undisputed that Defendant Gooding fired a shot which fatally injured the Deceased. Defendant Gooding testified that the Deceased was coming towards him [Gooding] at a fast pace, "more than a fast walk." Gooding Deposition (Ex. 2 to Docket No. 13), p. 117. Plaintiff testified that the Deceased "was unable to run without losing his balance and falling to the ground." C. Thompson Affidavit (Docket No. 22), ¶4. Mrs. Thompson testified that her son "couldn't run," "couldn't walk real good" because the brain damage "damaged

his legs." O. Thompson Deposition (Ex. 6 to Docket No. 13), p. 29.

Defendant Gooding testified that the Deceased raised his arm, and one of the machetes was above his head, as if he was "fixing to throw" it. Gooding Deposition (Ex. 2 to Docket No. 13), pp. 94, 103–04, and 121; Gooding Affidavit (Docket No. 26), ¶ 7. Gooding stated that he "was in fear of losing his life." *Id.* Plaintiff testified that the Deceased could not raise his hands above his head without losing his balance and falling to the ground. C. Thompson Affidavit (Docket No. 22), ¶ 4.[2]

The parties also dispute whether the Deceased actually threw the machete. Officer Brady testified that one machete was found near the Deceased's right hand and the other was lying on the ground to the left of Defendant Gooding. Brady Deposition (Ex. 3 to Docket No. 20), pp. 39–40. Defendant Gooding testified that he never saw a machete coming toward him, but he believes one was thrown. Gooding Deposition (Ex. 2 to Docket No. 13), p. 95. He does not know where the machetes came to rest. *Id.,* p. 96. He assumes the Deceased threw it. *Id.,* p. 117.

Plaintiff, on the other hand, contends that both machetes were next to the body of the Deceased immediately following the shooting and that one of the officers took the machetes and put them into the patrol car. Cecil Pewitt Deposition (Ex. 4 to Docket No. 13), pp. 14–17.

The Williamson County Sheriff's Department policy or procedure on the use of deadly force, at the time of this incident, was that a member of the Department may use "deadly force ... in defending himself whenever he has reason to believe that such force is necessary to prevent death or great bodily harm to himself or another person." Affidavit of William LeCates (Docket No. 14), Attachment.

The Williamson County Sheriff's Department did not have a specific policy concerning recognizing and dealing with mentally disturbed or disabled persons. Gooding Deposition (Ex. 2 to Docket No. 13), p. 31; Brady Deposition (Ex. 3 to Docket No. 20), p. 16.

## SUMMARY JUDGMENT

As provided in Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 216.

The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989).

The Supreme Court concluded in *Anderson* that a dispute about a material fact is "genuine" within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the non-moving party's position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary

---

**2.** In addition, Defendant Gooding testified that he was approximately six to twelve feet from the Deceased when he fired the shot. Gooding Deposition (Ex. 2 to Docket No. 13), p. 104. Gooding testified that he and a TBI agent "approximated the distance that it would be and then measured it, and that came out to be approximately 15 feet." *Id.,* p. 105. Officer Brady, who arrived soon after the shooting, testified that when he arrived, Defendant Gooding and the Deceased were six to seven yards apart. Brady Deposition (Ex. 3 to Docket No. 20), p. 42.

judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co. v. Elmore Dev. Co., Inc.,* 921 F.2d 1343, 1349 (6th Cir.1991). The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

## SECTION 1983

### A. DEFENDANT GOODING

Plaintiff asserts that the actions of Defendant Gooding, acting under color of law as a deputy sheriff for Defendant Williamson County, Tennessee, constituted an unreasonable and unnecessary use of deadly force against the Deceased in violation of rights secured by the Fourth, Eighth and Fourteenth Amendments of the U.S. Constitution. Complaint, ¶ 9. Defendants contend that Defendant Gooding is entitled to qualified immunity. This Court disagrees.

To successfully state a claim under Section 1983, Plaintiff must identify a right secured by the U.S. Constitution and the deprivation of that right by a person acting under color of state law. *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir.1994). Governmental officials performing discretionary functions are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Id.; see also Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) and *Martin v. Heideman,* 106 F.3d 1308, 1312 (6th Cir.1997).

■ When a defendant files a motion for summary judgment based on qualified immunity, a plaintiff must effectively pass two hurdles. *Buckner v. Kilgore,* 36 F.3d 536, 539 (6th Cir.1994). "First, the allegations must state a claim of the violation of clearly established law. Second, the plaintiff must present evidence sufficient to create a genuine issue as to whether the defendant in fact committed the acts that violated the law." *Id.*

■ Whether qualified immunity is applicable to an official's action is a question of law. *Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir.1996). The burden is on the plaintiff to allege and prove that the defendant official violated a clearly established constitutional right. *Buckner,* 36 F.3d at 539. If it is determined that the right is clearly established, the court must determine whether the plaintiff has alleged sufficient facts supported by sufficient evidence to indicate what the officer allegedly did was objectively unreasonable in light of the clearly established constitutional rights. *Dickerson,* 101 F.3d at 1158; *Adams,* 31 F.3d at 378.

■ Both the right to be free from unreasonable seizures and the right to be free from the use of excessive force under the Fourth Amendment are clearly established. *Buckner,* 36 F.3d at 539; *Adams,* 31 F.3d at 386–87. "The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon." *Tennessee v. Garner,* 471 U.S. 1, 9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985).

Thus, the issue to be decided here is whether Plaintiff has presented sufficient facts to indicate that what Defendant Gooding allegedly did was objectively unreasonable in light of these clearly established constitutional rights. *Adams,* 31 F.3d at 387.

■ Excessive force claims are to be analyzed under the Fourth Amendment's "objectively reasonable" test. *Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir. 1993). Where the excessive force claim

arises, as here, in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as invoking the protections of the Fourth Amendment, which guarantees citizens the right to be secure in their persons against unreasonable seizures of the person. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). "There can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1.[3]

■ Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871. Factors to consider include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

■ The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. *Id.; Walton*, 995 F.2d at 1342. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872.

The Sixth Circuit has noted that the question is whether "any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Adams*, 31 F.3d at 387. Although this question is a purely legal one, the court

may not be able to make a determination if the underlying character of the actions allegedly taken by the defendant is disputed. *Id.*

In other words, if the legal question of immunity depends upon which view of the facts is accepted by the jury, summary judgment cannot be granted. *Adams*, 31 F.3d at 387; *see also Buckner*, 36 F.3d at 540 ("As there are genuine issues of fact regarding which version of the facts occurred, summary judgment based on qualified immunity would be inappropriate."). "Summary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendants committed acts that allegedly violated clearly established rights." *Dickerson*, 101 F.3d at 1158.

■ Summary judgment is not appropriate if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). In other words, if genuine issues of material fact exist as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity is improper. *Walton*, 995 F.2d at 1336.

In the recent case of *Martin v. Heideman*, 106 F.3d 1308 (6th Cir.1997), the Sixth Circuit held, once again, that because a genuine issue of material fact existed as to whether the officer used excessive force under the circumstances, the district court erred in granting qualified immunity. *Id.* at 1313. The plaintiff in *Martin* alleged that the defendant officer used excessive force in handcuffing. The court analyzed the "excessively forceful handcuffing" claim under the "general excessive force rubric," and found that a genuine issue of material fact as to whether the officer used excessive force under the circumstances precluded a grant of qualified immunity. *Id.*

---

**3.** *Garner* is distinguishable from the instant case in that it dealt with deadly force used to prevent the escape of a felony suspect. Here, the De-

ceased was neither a felony suspect nor trying to escape.

Here, there are numerous disputed issues of fact. Some are material; some are not. As noted above, the Court must view the facts in the light most favorable to the non-moving party, the Plaintiff. *See Dickerson,* 101 F.3d at 1155, n. 2 ("to the extent there are factual disputes, we must view the facts in the light most favorable to the plaintiffs to determine whether genuine issues of material fact preclude the grant of summary judgment based on qualified immunity").

The Court must also consider only the facts which the officer knew at the time of the alleged Fourth Amendment violation. *Dickerson,* 101 F.3d at 1155, n. 3. Here, as explained above, the parties dispute just how much Officer Gooding knew about the Deceased's impaired mental condition at the time of the shooting. Plaintiff's expert, Phillip L. Davidson, opines that Defendant should have taken different actions with regard to the Deceased because of his mental disability. Davidson Affidavit (Docket No. 21), pp. 7–8.

The parties also dispute just what happened in the seconds before the Deceased was killed. Plaintiff claims that the Deceased was physically incapable of threatening Defendant Gooding in the manner in which Defendant Gooding testified. Defendant Gooding and the Deceased were the only eyewitnesses to this incident. Defendant Gooding's credibility, therefore, is extremely important. "It is the province of the jury, not the court, to decide on the credibility of the defendant's account of the need for force." *Adams,* 31 F.3d at 387.

Defendants' reliance upon Tennessee Code Annotated Section 39–11–620 (Use of Deadly Force) is misplaced. That statute relates to *criminal* responsibility. It falls within a section of the *criminal* code headed "Justification Excluding Criminal Responsibility." In fact, Section 39–11–605 specifically states: "The fact that conduct is justified under this part does not abolish or impair any remedy for the conduct that is or may be available in a civil suit." Tenn.Code Ann. § 39–11–605.

Section 40–7–108, which falls within the Criminal Procedure section of the Code and is called "Resistance to Officer", provides:

(a) A law enforcement officer, after giving notice of his identity as such, may use or threaten to use force that is reasonably necessary to accomplish the arrest of an individual suspected of a criminal act who resists or flees from the arrest.

(b) Notwithstanding subsection (a), the officer may use deadly force to effect an arrest only if all other reasonable means of apprehension have been exhausted or are unavailable, and where feasible, the officer has given notice of his identity as such and given a warning that deadly force may be used unless resistance or flight ceases, and:

(1) The officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or

(2) The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

Tenn.Code Ann. § 40–7–108 (1990).

As noted, there are genuine issues of material fact with regard to what exactly happened during the last few minutes of the Deceased's life. Specifically in terms of this statute, there are questions of fact as to whether Defendant Gooding's conduct was justified under the circumstances.

For example, there is an initial question of fact as to whether the Deceased was even "suspected of a criminal act." There are questions of fact as to whether the Deceased was resisting or fleeing from arrest; about whether all other reasonable means of apprehension had been exhausted or were unavailable; and about whether Defendant Gooding had probable cause to believe that the Deceased posed a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

There are also issues of fact here as to how far apart the Deceased and Defendant Gooding were at the time of the shooting; as to how many warnings Defendant Gooding actually gave; as to whether Defendant Gooding could have exercised other options before

using deadly force. All these issues are important in the question of whether Defendant's actions were "reasonable." As the court stated in *Adams*, "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Adams*, 31 F.3d at 387.

In *Dickerson*, the plaintiff argued that persons have a clearly established right not to be shot unless they pose a threat to a pursuing officer or others. *Dickerson*, 101 F.3d at 1163. Defendants countered that the law is clearly established that if a suspect threatens an officer with a weapon or threatens another person with serious physical harm or death, deadly force is authorized in self-defense or defense of another person. *Id.*

The Sixth Circuit Court of Appeals held that both statements of the law are correct. *Id.* However, when the facts were viewed in the light most favorable to the plaintiff, as they must be in this case as well, the court found no qualified immunity because there were questions of fact as to what really happened just prior to the use of deadly force. *Id.* at 1163–64.

■ Similarly here, Plaintiff has presented sufficient evidence to create genuine issues as to whether Defendant Gooding used excessive force under the circumstances. Therefore, summary judgment on the issue of qualified immunity is not appropriate.

## B. WILLIAMSON COUNTY

■ A political subdivision such as a county is liable under Section 1983 only for injuries that result from an official policy or from governmental custom, even though such custom has not been formally approved. *Heflin v. Stewart County, Tenn.*, 958 F.2d 709, 716 (6th Cir.), *cert. denied*, 506 U.S. 998, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). Section 1983 extends liability only to persons who "cause" constitutional violations, and municipalities do not "cause" constitutional violations solely by having employed a constitutional tortfeasor. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654–55 (6th Cir.), *cert. denied*, 510 U.S. 826, 114 S.Ct. 90, 126 L.Ed.2d 57 (1993).

Here, Defendants contend that Plaintiff's cause of action against Defendant Williamson County cannot be sustained because the county had a clear policy regarding the use of deadly force, and that policy was consistent with the parameters set forth by the Supreme Court in *Garner*. This Court, for purposes of this motion, assumes that the Williamson County policy on the use of deadly force by an officer is consistent with the law set forth in *Garner*.

There are further questions regarding the liability of this governmental Defendant under Section 1983, however. Plaintiff's expert, Mr. Davidson, opines that "Williamson County exhibited a deliberate indifference to the rights of citizens that its deputies might come into contact with those who are suffering from mental illness by not adequately training its deputies in recognizing and handling mentally disturbed persons." Davidson Affidavit (Docket No. 21), p. 6.

It appears to be undisputed that the Williamson County Sheriff's Department did not have a specific policy concerning recognizing and dealing with mentally disturbed or disabled persons. *See* Gooding Deposition, p. 31; Brady Deposition, p. 16.

■ The Court finds that Mr. Davidson's Affidavit creates genuine issues of material fact as to whether Williamson County should be liable for its failure to adequately instruct and train its officers in dealing with mentally disturbed individuals and for failure to have a specific policy for recognizing and dealing with mentally disturbed persons.

Furthermore, Defendant Williamson County is also sued in this action pursuant to Tennessee Code Annotated Section 8–8–302, which provides: "Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office." Tenn. Code Ann. § 8–8–302. Complaint, ¶ 9.

This statute, which authorizes suit against a county based upon the acts of a deputy sheriff if the deputy is, at the time, acting by

virtue of or under color of his office, has been upheld as constitutional. *Grundy County v. Dyer*, 546 S.W.2d 577 (Tenn.1977). The court noted that this statute "sanctions suits against counties for the misconduct of deputies and represents a waiver of governmental immunity." *Id.* at 580.

In *Jenkins v. Loudon County*, 736 S.W.2d 603 (Tenn.1987), the court stated that actions for non-negligent misconduct of deputies do not arise pursuant to the Governmental Tort Liability Act and may therefore be covered by this statute, Section 8–8–302, in appropriate cases. *Id.* at 609; *see also Hensley v. Fowler*, 920 S.W.2d 649, 651–52 (Tenn.Ct. App.1995).

Therefore, the Court DENIES Defendant Williamson County's Motion for Summary Judgment on the issue of liability under Section 1983, since it may be liable for the actions of Defendant Gooding, as set forth above. Just as there are genuine issues of material fact with regard to Defendant Gooding, such genuine issues of material fact preclude summary judgment for Defendant Williamson County as well.

### AMERICANS WITH DISABILITIES ACT/REHABILITATION ACT

Plaintiff asserts that Defendants "denied emergency medical care treatment" for the Deceased "solely on the basis that he was suffering from a certified mental impairment," in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

The ADA provides: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (1995).

Similarly, the Rehabilitation Act provides: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a) (Supp. 1997).

To show a violation of the ADA,[4] Plaintiff must show disability, denial of public benefit, and that such denial or discrimination was by reason of the disability. *Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir.1996).[5]

Thus, in order to proceed with an ADA claim, Plaintiff must meet the threshold burden of showing that the Deceased was a "disabled" individual within the meaning of the ADA. *Vaughan v. Harvard Industries, Inc.*, 926 F.Supp. 1340, 1345 (W.D.Tenn. 1996). Plaintiff asserts that it is undisputed that the Deceased was a "qualified individual with a disability." Plaintiff's Response (Docket No. 20), p. 16. Although Defendants do not raise this issue, it is far from clear to the Court that the Deceased met the specific definitions of "qualified individual with a disability" under the ADA and the Rehabilitation Act.

For example, under the specific subchapter of the ADA at issue herein, a "qualified individual with a disability" is defined as:

> an individual with a disability whom, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

---

4. Analysis of claims under the ADA roughly parallels those brought under the Rehabilitation Act of 1973. *Maddox v. University of Tenn.*, 62 F.3d 843, 846 (6th Cir.1995). In addition, remedies, procedures, and rights set forth in Section 794a of the Rehabilitation Act shall be the remedies, procedures, and rights under the public services chapter of the ADA. 42 U.S.C. § 12133 (1995).

5. Plaintiffs suing under the Rehabilitation Act must also establish that the defendant receives federal funding. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178, n. 4 (6th Cir.1996).

42 U.S.C. § 12131(2) (1995). Plaintiff has presented no proof with regard to these factors.

"Disability" under the ADA is defined in three ways: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (1995).

■ Plaintiff has produced no medical proof whatsoever, no expert testimony, only the testimony of his wife and himself, to support the allegation that the Deceased was a "qualified individual with a disability." Plaintiff may be able to prove this element of his claim, but he has not done so. And, as noted above, on a summary judgment motion, the non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Cloverdale Equip. Co. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989).

Even if it is proven that the Deceased was a qualified individual with a disability, however, Plaintiff has presented no evidence to support a claim that the Deceased was denied public services *because of* that disability. Viewing the facts in the light most favorable to the Plaintiff and accepting his allegation that the family requested medical services for the Deceased, there is no proof that those services were denied because of the Deceased's alleged disability.

In other words, there is no proof of a causal connection between the denial of medical services and the disability of the Deceased. Plaintiff has not shown, in the words of the statute itself, that any action to deny medical services was "by reason of such disability." 42 U.S.C. § 12132 (1995). Therefore, his ADA and Rehabilitation Act claims must fail.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED on the issues of the ADA and Rehabilitation Act claims, and those claims are DISMISSED.

## STATE LAW CLAIMS [6]

### A. *WRONGFUL DEATH*

Defendants argue that Defendant Gooding was justified in using deadly force under the circumstances of this case and, therefore, Plaintiff's wrongful death claim must fail. As support, Defendants rely upon two sections of Tennessee's criminal statutes, Section 39–11–620 and Section 40–7–108. As shown above, Section 39–11–620 is not applicable with regard to civil liability.

■ Also as noted above, there are factual issues about the factors to be considered under Section 40–7–108. For example, there are genuine issues of material fact about what exactly happened during the last few minutes of the Deceased's life. There are questions of fact as to whether Defendant Gooding's conduct was justified under the circumstances.

For these reasons, Defendants' Motion for Summary Judgment is DENIED on Plaintiff's state law wrongful death claim.

### B. *ASSAULT AND BATTERY*

Defendants cite a criminal statute in support of their assertion that Plaintiff's assault and battery tort claim should be dismissed. Because the criminal statute does not provide for a private cause of action, the Court must look to Tennessee common law to find the elements of the civil cause of action for assault. *Vafaie v. Owens,* 1996 WL 502133 at * 3 (Tenn.Ct.App.1996).

■ At common law, assault was defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against that person." *Id.* (citing *Huffman v. State,* 200 Tenn. 487, 292 S.W.2d 738, 742 (1956), *overruled on other grounds* by *State v. Irvin,* 603 S.W.2d 121 (Tenn.1980)).

**6.** In connection with the state law claims, Defendants do not contest the potential liability of Defendant Williamson County pursuant to Tennessee Code Annotated Section 8–8–302.

A "battery" is "any intentional, unlawful and harmful (or offensive) contact by one person with the person of another." *Raines v. Shoney's, Inc.*, 909 F.Supp. 1070, 1083 (E.D.Tenn.1995).

In Tennessee, it is elementary that there cannot be an assault and battery without a willful injury of the person upon whom the wrong is inflicted. *Moffitt v. United States*, 430 F.Supp. 34, 37 (E.D.Tenn.1976). The word "willful" means nothing more than intentional. *Id.* In other words, an indispensable element of the evidence necessary to support an assault or battery cause of action is that the striking is willful and intentional. *Id.*

In light of its ruling on Plaintiff's Section 1983 claim, the Court finds that the disputed factual issues set forth above preclude summary judgment on the claims of assault and battery as well. Accordingly, Defendants' Motion for Summary Judgment on the state law claims of assault and battery is DENIED.

## C. OUTRAGEOUS CONDUCT

Defendants argue basically that the conduct of Defendant Gooding does not rise to the level required to find outrageous conduct. Plaintiff argues that there exist genuine issues of material fact as to whether Defendant Gooding's conduct rises to such a level.

In Tennessee, damages may be recovered for serious emotional distress intentionally or recklessly inflicted by outrageous conduct which exceeds in degree willful and wanton misconduct. *Gann v. Key*, 758 S.W.2d 538, 546 (Tenn.Ct.App.1988).

"It is not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement Second of Torts, § 46, comment d; *Medlin v. Allied Investment Co.*, 217 Tenn. 469, 398 S.W.2d 270, 274 (1966).

Viewing the facts in the light most favorable to the Plaintiff, the Court finds that no reasonable jury could find that the Defendant's conduct rises to the level of outrageous conduct in this case. As noted, even if the Plaintiff is able to prove his claim for intentional conduct, in violation of the Deceased's civil rights and constituting an intentional tort, more is required in order to prove outrageous conduct.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED on this state law issue, and Plaintiff's claim for outrageous conduct is DISMISSED.

## D. NEGLIGENCE

The Court believes that the parties have not adequately briefed Plaintiff's alternative state law claim of negligence.

"Negligence is ordinarily an issue to be decided by a jury and can be withdrawn from the jury only in those cases where the facts are established by evidence free from conflict and the inference from the facts is so certain that all reasonable minds must agree." *Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn.1993). Here, there are clearly facts in dispute which may preclude summary judgment on the issue of negligence.

Neither side, however, has addressed whether the Governmental Tort Liability Act applies to this state law claim, and if so, how it affects Defendants' liability.

Accordingly, Defendants' Motion for Summary Judgment on the issue of negligence is DENIED, without prejudice to its being refiled and fully briefed at a later date.

## CONCLUSION

For all the reasons set forth herein, Defendants' Motion for Summary Judgment (Dock-

et No. 11) is DENIED on Plaintiff's Section 1983 claim; GRANTED on Plaintiff's ADA and Rehabilitation Act claims, and those claims are DISMISSED; DENIED on Plaintiff's wrongful death, assault and battery, and negligence claims; and GRANTED on Plaintiff's outrageous conduct claim, and that claim is DISMISSED.

It is so ORDERED.