**Samuel D. LOWERY, Jr., Plaintiff,**

v.

**Arlene FAIRES, individually and as a representative of an association of persons purportedly acting under the name of Pets are Lovable Society a/k/a PALS and Don Bird, individually and as Deputy Sheriff of Bradley County, Tennessee, Defendants.**

**No. 1:97–CV–376.**

United States District Court, E.D. Tennessee, at Chattanooga.

May 26, 1998.

---

484

James F. Logan, Jr., Logan, Thompson, Miller, Bilbo, Thompson & Fisher, Cleveland, TN, for Samuel D. Lowery, Jr. dba Lowery Brothers, plaintiffs.

Conrad Finnell, Conrad Finnell PC & Associates, Cleveland, TN, for John Thompson, Jeff Howard.

James S. Webb, Webb & Humberd, Ashley L. Ownby, Cleveland, TN, Elaine B. Winer, Rice & Winer, PC, Chattanooga, TN, for Arlene Faires.

James S. Webb, Webb & Humberd, Cleveland, TN, Elaine B. Winer, Chattanooga, TN, for Don Bird.

## MEMORANDUM

COLLIER, District Judge.

In this dispute over the seizure of beef cattle owned by Plaintiff Samuel Lowery, Jr. ("Lowery") by Bradley County, Tennessee Sheriff's deputies Don Bird ("Bird") and Arlene Faires ("Faires") and others, Lowery seeks damages pursuant to 42 U.S.C. § 1983. Before the Court are Defendants Faires's, Bird's, Pets are Lovable Society's ("PALS"), and the Bradley County Sheriff's Department's Motion for Summary Judgment (Court File No. 17) and Lowery's response (Court File No. 21). For the following reasons, the Court will GRANT Defendants' motion to the extent it seeks dismissal of Lowery's § 1983 claim, DENY Defendants' motion to the extent it seeks dismissal of Lowery's state law claims, DECLINE to exercise supplemental jurisdiction over Lowery's state law claims, and REMAND this case to the Circuit Court for Bradley County, Tennessee.

## I. RELEVANT FACTS

### Genesis of the Problem

Prior to the seizure, Lowery had been in the cattle business for many years. Approximately 350 head of Lowery's cattle were pastured on two farms he leased in Georgia. Approximately 100 head were pastured on his Bradley County farm. The two Georgia farms were sold resulting in Lowery losing his lease. In September and October of 1993, Lowery moved his cattle from the two Georgia farms to his Bradley County farm. This move resulted in over 450 head of cattle on Lowery's 500 acre Bradley County farm.

Although disputed, it appears abundantly clear that the concentration of so many cattle on the one farm immediately created dire food shortages for the cattle. Finding the 500 acres insufficient to supply their food needs, the cattle began escaping from the farm and foraging on their own for food. According to the defendants, the cattle entered neighbor's land, damaged property, ruined gardens, ate wheat from neighbor's wheat fields, and constituted a general health and safety hazard. Faires [1] testified "cattle were getting out, wrecks were occurring," "property was being destroyed . . .," and animals were starving. As a result of the cattle's search for food they journeyed across roads and onto other's property. According to Faires and Bird [2], the Bradley County Sheriff's Department received over 90 complaints about the cattle. Faires testified the complaints indicated the cattle were "running at large. They were on their [neighbor's] porches, mooing in their windows, eating their wheat fields. They were charging people. There were ruining people's property, leaving droppings everywhere, [and] ruining gardens. They were dying and they weren't being buried. The stench was pretty bad" (Deposition of Faires at p. 8, Court File No. 21). One of the law enforcement agents from the Agricultural Department "said it was one of the worst situations he had seen" (Deposition of Bird at p. 10, Court File No. 21).

In October of 1993, Lowery and his uncle, Frank Lowery, were summoned to the General Sessions Court of Bradley County based on a complaint charging violations of *Tenn.Code Ann.* §§ 44-8-401 (Livestock Running at Large) and 39-14-202 (Cruelty to Animals). Faires also discussed the situation with both Lowery and Frank Lowery. Prior to the seizure, Lowery admits Frank Lowery had told him of complaints about the marauding cattle. Lowery also admitted he knew the cattle were escaping. Lowery testified he tried to return the cattle to his farm and repair the fence through which the cattle were escaping.

---

1. Arlene Faires was a volunteer reserve officer with the Bradley County Sheriff's Department and a member of the board of directors of Pets are Lovable Society (PALS).

2. Don Bird was the Chief Deputy for the Bradley County Sheriff's Department.

### Sheriff's Office's Response

On two separate occasions, Bird and Faires attempted to obtain an order from the General Sessions Court permitting the impoundment of Lowery's cattle. Both requests were denied. Bird and Faires then met with Assistant District Attorney General Rebel Johnson and were informed they could impound the cattle pursuant to *Tenn.Code Ann.* § 39–14–210 which states:

(a) The agents of any society which is incorporated for the prevention of cruelty to animals, upon being appointed thereto by the president of such society in any county, may, within such county, make arrests, and bring before any court thereof offenders found violating the provisions of this part with regard to non-livestock animals.

(b) Any officers, agents, or members of such society may lawfully interfere to prevent the perpetration of any act of cruelty upon any animal in such person's presence. Any person who interferes with or obstructs any such officer, agent, or member in the discharge of this duty commits a Class C misdemeanor.

(c) Any agent or officer of such society may lawfully destroy, or cause to be destroyed, any animal found abandoned or otherwise . . . .

### The Impoundment

On November 17, 1993, Faires and a veterinarian traveled to the Lowery farm to evaluate the cattle. The veterinarian found there was inadequate pasture for the cattle. The veterinarian also noted many of the cattle were dying and there were decomposing carcasses next to where other cattle were feeding. On November 18, 1993, Bird and Faires along with several farmers from the community traveled to Lowery's farm. When Bird, Faires, and the others arrived at the farm, they were met by Frank Lowery. Samuel Lowery was ill and was not present. Frank Low-

ery was served with a notice of impoundment for the cattle. The notice read as follows:

To: Frank and Sammy Lowery
November 18, 1993

From: PALS, PETS ARE LOVABLE SOCIETY

Your cattle are being impounded according to the laws of this state, Tennessee, for their protection and the protection of the public.

On 11–17–93, your property and cattle were evaluated by a practicing Tennessee licensed veterinarian. It was his qualified opinion that there was inadequate pasture for the size of the herd without supplemental feeding, inadequate fencing, 5 or more dead carcasses of cattle in different stages of decay which presents a health hazard due to the cattle eating next to carcass due to no supplemental feed, pattern [sic] of the cattle in the woods where there is nothing but scrub brush, said [sic] many would not survive the winter without hay or grain or both. He also asked about health certificates for those cattle brought in across state lines.

This action is being taken after repeated warnings from PALS [sic] representative [sic] and the Bradley County Sheriff [sic] Department. On 10–26–93, you were subpoened [sic] to the Court at the Bradley County Justice Center before Judge Bennett and several complainants due to the problems with your cattle. To secure the payment of costs, executions may be levied upon the stock impounded.

(Court File No. 18, Exh. 1).

Without a warrant, the parties then proceeded to seize several heads of cattle. The seizure continued through December 1993. After the seizure, Lowery contends he was left with only 6 head of cattle.[3]

---

**3.** Defendants dispute this contention and allege they seized only 270 head of Lowery's cattle.

Lowery also contends he did not have a hearing prior to the seizure.

### The Litigation

In December of 1993, the criminal charges against Lowery were brought before the grand jury. A true bill was returned against Lowery for the charge of letting the cattle run at large and Lowery paid a $25 fine. A no bill was returned on the charge of cruelty to animals. On March 1, 1994, Lowery then brought suit in the Chancery Court of Bradley County, Tennessee, against Faires, individually and as a representative of PALS, and Don Bird, individually and as Deputy Sheriff of Bradley County, alleging "the plaintiff should be granted judgment against the defendants for the value of the cattle which were taken, for the trespass and destruction of personal property which occurred to the property which was under the control of the plaintiff" (Court File No. 1, Exh. 1, ¶ 16(d)). John Thompson and Jeff Howard filed intervening petitions against the Defendants alleging they were owed for the pasturing, feeding, and care they provided after the cattle were seized.[4] Thompson and Howard also asserted a lien against Lowery for any unjust enrichment he may have received as a result of Thompson's and Howard's pasturing, feeding, and caring for Lowery's cattle. PALS answered the complaint and filed a counterclaim against Samuel Lowery and a third party complaint against Frank Lowery.[5] Bird and Faires also answered Lowery's complaint (Court File No. 16, Exhs. 1 and 2).

Lowery and the Defendants agreed to sell the seized cattle and deposit the funds from the sale with the clerk's office pending resolution of this litigation. Accordingly, on April 5, 1994, Chancellor Earl Henley signed an Order permitting Lowery to take up to forty head of cattle and directing the other seized cattle sold at auction. At the auction, Lowery reclaimed some of his cattle and also purchased a few bringing his herd to 100 head of cattle. The proceeds from the sale of the remaining cattle were deposited by the Clerk & Master.

On September 1, 1994, the case was transferred to the Circuit Court for Bradley County, Tennessee. On June 26, 1997, Lowery amended his complaint to state a § 1983 claim. Defendants then removed the case to this Court. Defendants have filed a motion for summary judgment on Lowery's § 1983 claim and state law claims. With respect to the federal claim, Defendants argue Lowery's constitutional rights were not violated; Bird and Faires are entitled to qualified immunity on the § 1983 claim; and Lowery has failed to identify a custom, policy, or practice of Bradley County that resulted in any violation of Lowery's constitutional rights. Lowery responded and argued his constitutional rights had been violated.[6] The time for replies having passed, the motion is now ripe for the Court's decision.

## II. STANDARD OF REVIEW

Under *Fed.R.Civ.P.* 56(c), the Court will render summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.1994); *Kentucky Div., Horsemen's*

---

4. At the final pretrial conference, the parties informed the Court the intervenors' petition against Bradley County had been dismissed while the case was pending before the Circuit Court for Bradley County, Tennessee.

5. At the final pretrial conference, the parties informed the Court Frank Lowery has never been served with the third party complaint

and that they would file an agreed order of dismissal.

6. Lowery did not address Defendants' argument on qualified immunity for the § 1983 claim against Bird and Faires individually. Lowery also did not address whether the municipality acted pursuant to a custom, policy, or practice.

*Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.,* 20 F.3d 1406, 1411 (6th Cir.1994), and the Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oakland Gin Co., Inc. v. Marlow,* 44 F.3d 426, 429 (6th Cir.1995); *City Management Corp. v. U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir.1994).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lansing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 404–06 (6th Cir.1992) (holding courts do not have the responsibility to search *sua sponte* the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435–36 (6th Cir.1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411.

## III. DISCUSSION

Lowery's Amended Complaint alleged "In denying Plaintiff due process of law, Defendants violated Plaintiff's civil rights under 42 U.S.C. § 1983 when they converted his cattle without affording him due process of law" (Court File No. 21, Exh. I; *See* Court File No. 1, Exh. 5). "To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of law." *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir.1994) (citation omitted). Section 1983 alone creates no substantive rights; rather, it is a vehicle by which a plaintiff may seek redress for deprivation of rights established in the Constitution or federal laws. *See Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Paul v. Davis,* 424 U.S. 693, 699–701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). At the final pretrial conference, Plaintiff represented his claims were brought pursuant to the Fourteenth Amendment (procedural due process), Fifth Amendment (takings), and Fourth Amendment (unreasonable seizure). The Court will, first, address whether Plaintiff's claim can be sustained under these constitutional amendments. The Court will then address Lowery's state law claims.

### A. Fourteenth Amendment—Procedural Due Process

It is well settled the Fourteenth Amendment's due process clause protects life, liberty, and property interests. *Cleveland*

*Board of Education v. Loudermill,* 470 U.S. 532, 538 n. 3, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Once a plaintiff has established the deprivation of a life, liberty, or property interest, "the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

"The fundamental requirement of due process is the right to be heard 'at a meaningful time and in a meaningful manner.' " *Mertik v. Blalock,* 983 F.2d 1353, 1364 (6th Cir.1993) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). The Court's responsibility is to determine what process the Constitution guarantees the Plaintiff. "The goal is to minimize the risk of substantive error, to assure fairness in the decision-making process, and to assure that the individual affected has a participatory role in the process." *Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir.1996).

### *Parratt v. Taylor*

The Court finds this case is controlled by the United States Supreme Court's decision in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The Supreme Court teaches *Parratt* applies in cases when postdeprivation remedies are the only ones a state could be expected to provide because of the impossibility or impracticability of providing remedies prior to deprivation. *Zinermon v. Burch,* 494 U.S. 113, 128, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

*Parratt* involved a situation of impossibility. In that case, the plaintiff was an inmate at the Nebraska Penal and Correctional Complex. The plaintiff ordered by mail hobby materials valued at $23.50. Upon receipt of a package, established procedure was to deliver the package to the prisoner who would sign a receipt or notify the prisoner to pick up the package and sign a receipt. In either situation, the prisoner would sign for the delivered package. However, when the plaintiff's packages arrived at the prison, the plaintiff was in segregation and two employees in the prison hobby center signed for the delivery. Upon release from segregation, the plaintiff contacted several prison officials regarding the whereabouts of his packages, but the officials were not able to locate the packages or determine what caused their disappearance. The Court found that because the act which deprived the plaintiff of his property—the failure to follow established policy—was "random and unauthorized," officials could not predict when such a deprivation would occur and thus, it was impossible for the officials to provide a hearing prior to the deprivation. *See Parratt,* 451 U.S. at 541, 101 S.Ct. 1908;[7] *See also Zinermon,* 494 U.S. at 129, 110 S.Ct. 975 (In *Parratt,* "the very nature of a negligent loss of property made it impossible for the State to predict such deprivation and provide predeprivation process").[8]

In *Parratt,* the Court also described several prior Supreme Court decisions where it was recognized, in some instances, it may be impractical to provide a hearing prior to the deprivation. The Court noted,

> We have, however, recognized that postdeprivation remedies made available by the State can satisfy the Due Process Clause. In such cases, the normal predeprivation notice and opportunity to be heard is pretermitted if the State provides a postdeprivation remedy. In *North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), we upheld the right of a State to seize and destroy unwholesome food without a preseizure hearing. The possibility of erroneous destruction of property was outweighed by the fact

---

7. *Parratt* was decided before the Supreme Court ruled in *Daniels v. Williams,* 474 U.S. 327, 336, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), that a negligent act by a state official does not give rise to § 1983 liability.

8. In *Hudson v. Palmer,* 468 U.S. 517, 534, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Supreme Court extended the *Parratt* reasoning to intentional deprivations of property.

that the public health emergency justified immediate action and the owner of the property could recover his damages in an action at law after the incident. In *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), we upheld under the Fifth Amendment Due Process · Clause the summary seizure and destruction of drugs without a preseizure hearing. Similarly, in *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), we recognized that the protection of the public interest against economic harm can justify the immediate seizure of property without a prior hearing when substantial questions are raised about the competence of a bank's management. In *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944), we upheld in the face of a due process challenge the authority of the Administrator of the Office of the Price Administration to issue rent control orders without providing a hearing to landlords before the order or regulation fixing rents became effective....

*Parratt,* 451 U.S. at 538–539, 101 S.Ct. 1908.

### Harris v. City of Akron

The United States Court of Appeals for the Sixth Circuit also dealt with the issue of impracticability in *Harris v. City of Akron,* 20 F.3d 1396 (6th Cir.1994). In *Harris,* Ohio Edison Company, an electric utility, called the City of Akron Building Inspection Office to report a potential building hazard on Wooster Avenue in Akron. Akron's superintendent of building, Greg Burgoon, went to the reported location to investigate. Upon arrival, Burgoon found a two story brick building he believed was dangerously close to falling onto Wooster Avenue and a neighboring home. The upper east wall of the building had moved inward four to five feet, and Burgoon thought the roof was collapsing. Burgoon contacted John Hymes, the chief building inspector. Hymes examined the building and determined an emergency demolition was necessary as provided by Akron City Code § 190.705.[9] The city attempted to contact the owner of the building, John Harris, at his office, but Harris was not in. In an attempt to locate Harris, the city also contacted one of his acquaintances, Jim Gardner. Gardner provided two alternate addresses where Harris might have been. In fact, Harris was present at one of those addresses, but no one attempted to contact him there. Instead, the city hastily took bids for the demolition and, on the same day Ohio Edison . reported the damaged building to the building department, the entire building was demolished.

In *Harris,* the major dispute between the parties was whether an actual emergency existed that required an immediate demolition of the building. Plaintiff Harris argued no emergency existed and thus, the proper procedure the city should have utilized was codified at Akron City Code § 190.701 which states:

(A) The Superintendent of Building Inspection shall examine every building or structure reported as dangerous ... and he shall cause the report to be filed in a docket of unsafe structure, the nature and estimated amount of damages, if any, caused by collapse or failure.

(B) If the person to whom such notice and order is addressed cannot be found within the city after diligent search, then such notice and order shall be sent by certified mail to the last known address of such person. A copy of the notice

---

9. Akron City Code § 190.705 states:
   In case there shall be, in the opinion of the Superintendent of Building Inspection, actual and immediate danger of failure or collapse of a building or structure or any part thereof so as to endanger life or property, he shall cause the necessary work to be done to render the building or structure or part thereof temporarily safe. If the building or structure is in such a state of decay that it is impracticable to be repaired, he may order the building or structure razed or demolished.

shall be posted in a conspicuous place on the premises and postings shall be deemed adequate service.

Presumably, if the city had followed § 190.701 rather than the emergency procedures of § 190.705 then Harris would have had a "meaningful opportunity" to be heard prior to any deprivation. The Sixth Circuit, however, determined this case fit squarely within the parameters of *Parratt*. Thus, no predeprivation hearing was required and the issue of whether there was an actual emergency was immaterial. *Harris*, 20 F.3d at 1404.

### Zinermon v. Burch

*Harris* is an important decision because of the Supreme Court's ruling in *Zinermon*, 494 U.S. at 113, 110 S.Ct. 975. In *Zinermon*, the plaintiff was admitted to a state mental hospital and confined for a period of time pursuant to Florida's voluntary admission procedures. Later, the plaintiff brought a § 1983 action alleging the hospital doctors and administrators knew or should have known the plaintiff was incompetent to give informed consent to the "voluntary" admission. Plaintiff contended the proper procedure that should have been utilized was Florida's procedure for involuntary placement which required notice and a hearing before a person could be hospitalized for more than the brief time required for an evaluation. The Supreme Court held *Parratt* did not apply because the plaintiff's allegations did not involve a situation where it was impossible to predict when a deprivation would occur nor were the defendants' action completely "unauthorized." *Id.* at 136–138, 110 S.Ct. 975.[10]

Both *Harris* and *Zinermon* involved situations where it was alleged the defendants had acted pursuant to the wrong state policy and it was that error by the defendants which resulted in the deprivation of the plaintiff's property. However, *Zinermon* rejected the *Parratt* reasoning whereas *Harris* found *Parratt* was applicable. The Sixth Circuit explained the rationale for these different holdings:

> [W]e believe *Zinermon* is distinguishable. To the extent there was an emergency requiring the *Zinermon* plaintiff Burch to be hospitalized immediately, this could have been accomplished under *either* the voluntary or the involuntary admission procedure. *Zinermon*, 494 U.S. at 136–37, 110 S.Ct. at 989. If the state officials had followed the involuntary procedure, Burch would have been admitted for observation and evaluation over a limited time and would have had an opportunity to contest the findings prior to an indefinite commitment. He would not have been subjected to the seven months of confinement that resulted from his allegedly wrongful admission under the voluntary procedure.
>
> No such option was available to the Akron officials. If an emergency existed, the only available course of action for removing the threat to public health and safety was to carry out the demolition forthwith. Under these circumstances, there was no opportunity for notice and a predeprivation process. An erroneous determination that no emergency existed would have resulted in the very threat to the public that the code was intended to prevent. Thus, if there was an actual emergency, unlike in *Zinermon*, the authorities in this case could remove that emergency only by destroying the building. Following the nonemergency procedure of code § 190.702 would have left the emergency untreated and the public exposed to the resulting danger.
>
> In addition, *Zinermon* involved a liberty interest, not just property. In *Parratt* the Court quoted from two earlier opinions the rule that "[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for

---

**10.** In *Zinermon*, the plaintiff was challenging the dismissal of his complaint pursuant to *Fed.R.Civ.P.* 12(b)(6). Thus, plaintiff's allegations were assumed to be true.

ultimate judicial determination of liability is adequate." 451 U.S. at 540, 101 S.Ct. at 1915 (quoting *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 611, 94 S.Ct. 1895, 1902, 40 L.Ed.2d 406 (1974), in turn quoting *Phillips v. Commissioner*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 611–12, 75 L.Ed. 1289 (1931) (interior quotation marks omitted)). The facts and holding of *Zinermon* simply do not fit this case.

*Harris*, 20 F.3d at 1404.

### Analysis of this Case

█ In this case, Defendants argue no hearing was required prior to the seizure of Lowery's cattle because there was an emergency situation and the Defendants acted pursuant to an established state procedure, *Tenn.Code. Ann.* § 39–14–210. Thus, Defendants contend this case is similar to *Harris* and the *Parratt* reasoning applies. Interestingly, Lowery presents a few conflicting arguments for his procedural due process claim. In one portion of his brief, Lowery contends Defendants' actions were not authorized. If this is true, then Bradley County would not be able to predict when a deprivation would occur making it impossible to provide a predeprivation hearing.[11] This would also lead to the conclusion, though on a different basis than that argued by the Defendants, *Par-*

*ratt* applies. However, other portions of Lowery's brief argues there should have been a predeprivation hearing which is an argument opposite to *Parratt's* rationale. In another conflict, Lowery contends the appropriate procedure would have been for the Defendants to obtain a court order authorizing the impoundment. Since a warrant to seize property can be obtained *ex parte* upon a showing of probable cause, this type of procedure would not have provided Lowery with any predeprivation process. In this situation, the only process available would have been postdeprivation which again gives the impression Lowery is arguing for the application of *Parratt*.

As stated previously, the Court finds this case is controlled by *Parratt*. As also stated, Defendants contend *Tenn.Code. Ann.* § 39–14–210 which states it applies to "the agents of any society which is incorporated for the prevention of cruelty to animals" authorized Faires's actions, in her capacity as a representative of PALS, because the corporate charter of PALS states one of the organization's purposes is to "stimulate and enlist the interest and financial support of the community in the humane treatment of animals."[12] Lowery, however, contends PALS's corporate charter does not meet the confines of *Tenn. Code Ann.* § 39–14–210.[13] Arguably, the Tennessee State legislature could have in-

**11.** The Supreme Court explained in *Hudson v. Palmer*, 468 U.S. 517, 534, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), that the proper inquiry is not whether the individual employee, himself, is able is able to foresee a deprivation, but whether the state, or in this case the municipality, is in a position to provide for predeprivation process.

**12.** PALS's Corporate Charter lists the purposes of the organization as follows:

(a) The general purposes for which this corporation is formed are to operate exclusively for such educational and charitable purposes as will qualify it as an exempt organization undr [sic] Section 501(C)(3) of the Internal Revenue Code of 1954 or corresponding provision of any subsequent federal tax laws, including, for such purposes of the making of distri-

butions to organizations which qualify as tax exempt organizations under that Code.

(b) The specific and primary purposes of this corporation shall be to stimulate and enlist the interest and financial support of the community in the humane treatment of animals, to raise funds for public education campaigns as well as for specific projects to benefit the Cleveland Animal Shelter, and to work with the local government to upgrade animal control services in the community.

(Court File No. 21, Appendix A, p. 2).

**13.** Lowery also disputed whether Defendants' actions were authorized under *Tenn.Code Ann.* § 39–14–207. However, the Court finds it unnecessary to address this issue since the Defendants never argued that code section authorized their conduct.

tended *Tenn.Code Ann.* § 39–14–210 to only apply to humane societies such as the Animal Shelter in Cleveland, Tennessee [14] rather than to organizations like PALS whose activities appear to be more educationally based. In the absence of any evidence regarding the legislators' intent, the Court, for purposes of this opinion only, will adopt Lowery's argument and assume the actions of Faires, Bird, and the others were not authorized by *Tenn.Code Ann.* § 39–14–210.[15]

As will become clear, the Court's assumption that Defendants' seizure of the cattle was not authorized by *Tenn.Code Ann.* § 39–14–210 is not fatal to the application of *Parratt* to this case because the Defendants were still faced with an emergency which made a predeprivation hearing impractical. In addition, the Court's assumption means the Defendants' actions in response to the emergency were "random and unauthorized" and thus, a predeprivation hearing was impossible. The Court will explain each of these conclusions.

The danger created by the cattle on Lowery's property presented the Defendants with an emergency situation. The cattle were breaking through the fences and wandering onto the road and other people's property. The cattle were causing vehicle accidents and creating other hazards. There had been over 90 complaints. On the day prior to the seizure, a veterinarian evaluated the cattle and found many were dying. There were also decomposing carcasses lying next to where other cattle were eating. This presented an extreme health hazard. Lowery disputes whether there was any actual "cruelty" to animals being committed and thus, whether there was an emergency situation.

However, as the *Harris* case explains this dispute is not "material." *See Harris,* 20 F.3d at 1404. Even when the Court assumes the Defendants were not acting in accordance with an established state procedure as the parties were acting under in *Harris,* the Court still finds the Defendants were faced with the similar situation of only one option—to take immediate action. Applying *Harris* to the present case results in the same reasoning, "An erroneous determination that no emergency existed would have resulted in the very threat to the public [that the Defendants were attempting] to prevent. *See id.* Thus, if there was an actual emergency [the Defendants in this case] could remove that emergency only by [seizing the cattle]." Taking the time for a predeprivation hearing was impractical because it "would have left the emergency untreated and the public exposed to the resulting danger." *Id.*

Based on the Court's assumption that *Tenn.Code Ann.* § 39–14–210 does not apply to organizations such as PALS, the Court finds the Defendants did not act pursuant to an established state procedure and thus, their actions were unauthorized. The Defendants' actions were also random in that the municipality could not predict when such a deprivation would occur.[16] Without being able to predict a deprivation, it is impossible for the municipality to provide a predeprivation hearing.

■ Having found it was not only impractical, but also impossible, for the municipality to provide Lowery with a predeprivation hearing, this case falls squarely within the parameters of *Parratt.*[17] This does not end the Court's inquiry, however. As *Parratt* explains, even when it is impractical or impossible to provide a prede-

---

**14.** The Animal Shelter in Cleveland, Tennessee also oversees any activity in Bradley County.

**15.** As the Court will explain, the *Parratt* reasoning applies even if Defendants' seizure of the cattle was not authorized by *Tenn.Code Ann.* § 39–14–210.

**16.** *See* footnote 11.

**17.** While the Court has found it was both impractical and impossible to provide a predeprivation hearing, *Parratt* only requires a finding on one of these elements for the claim to fall within its parameters. *Parratt,* 451 U.S. at 539, 101 S.Ct. 1908.

privation hearing, "that does not mean, of course, that the State can take property without providing a meaningful postdeprivation hearing. The prior cases which have excused the prior-hearing requirement have rested in part on the availability of some meaningful opportunity subsequent to the initial taking for a determination of rights and liabilities." *Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. The Supreme Court then held an adequate state remedy could satisfy the due process postdeprivation hearing requirements. *See id.* at 543–544, 101 S.Ct. 1908; *Hudson v. Palmer,* 468 U.S. 517, 534–535, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

"It is up to plaintiffs to demonstrate that there are no state remedies available." *Huron Valley Hosp., Inc. v. City of Pontiac,* 887 F.2d 710, 716 (6th Cir.1989) (*citing Sproul v. City of Wooster,* 840 F.2d 1267, 1270 (6th Cir.1988) and *Campbell v. Shearer,* 732 F.2d 531, 533–534 (6th Cir.1984)); *See also Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995) (*citing Vicory v. Walton,* 721 F.2d 1062, 1066 (6th Cir.1983)) ("The plaintiff must plead and prove the state remedies for redressing the wrong are inadequate"). While Lowery's brief acknowledged this was an element of proof, he has neither plead, nor more importantly at this stage in the litigation, proved the inadequacy of state remedies. In fact, Lowery has done the opposite by pleading and pursuing several state law causes of action. At one point in his brief, however, Lowery contended he could not "be adequately compensated for his loss by postdeprivation remedies" (Court File No. 21, p. 16). To the extent this statement may refer to the adequacy of state remedies, Lowery's statement is unsupported by any evidence. Furthermore, the Supreme Court has stated "that [the plaintiff] might not be able to recover under [the state remedies] the full amount he might receive in a § 1983 action is not ... determinative of the adequacy of state remedies." *See Hudson,* 468 U.S. at 535, 104 S.Ct. 3194; *See also Parratt,* 451 U.S. at 544, 101 S.Ct. 1908.

In *Parratt,* because of the availability of an adequate, postdeprivation state remedy, the Supreme Court concluded "the [plaintiff] has not alleged a violation of the Due Process Clause of the Fourteenth Amendment." *Parratt,* 451 U.S. at 543, 101 S.Ct. 1908. This Court reaches a similar conclusion in this case. Lowery has failed to prove the available postdeprivation remedies are inadequate. Accordingly, the Court will **GRANT** Defendants' Motion for Summary Judgment with respect to Lowery's § 1983 claim based on a violation of the Fourteenth Amendment right to procedural due process.[18]

### B. Fifth Amendment—Takings

■■ "Because the Fifth Amendment proscribes takings without just compensa-

---

18. If the Court had found there was a constitutional violation, Bird and Faires would have been entitled to qualified immunity for the claims asserted against them individually. This is because in deciding whether to seize Lowery's cattle, both Bird and Faires were performing discretionary acts since both exercised significant decision making authority. As Lowery has not produced any evidence Bird and Faires "violated a right so clearly established that any official in defendants' position would have clearly understood that they were under an affirmative duty to refrain from such conduct," Lowery has failed to prove Bird and Faires are not entitled to qualified immunity. *See Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir. 1992).

"A municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Board of the County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). "A plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* (*citing Monell [v. Dept. of Social Serv. of City of New York],* 436 U.S. [658,] 694[, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)]; *Pembaur [v. City of Cincinnati],* 475 U.S. [469] at 480–481[, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)]; and *Canton [v. Harris],* 489 U.S. [378] at 389[, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)]). "A plaintiff must [also] show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct

tion, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." *Williamson County Regional Planning Comm. v. Hamilton Bank of Johnson City,* 473 U.S. 172, 195 n. 13, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). "If a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *G.M. Engineers and Assocs., Inc. v. West Bloomfield Township,* 922 F.2d 328, 330 (6th Cir.1990) (*quoting Williamson County,* 473 U.S. at 195, 105 S.Ct. 3108). "Thus, in order to state a claim, the plaintiff must show 'that the inverse condemnation procedure is unavailable or inadequate ....' " *Id.* (*quoting Williamson County,* 473 U.S. at 197, 105 S.Ct. 3108). "Because plaintiff 'makes no claim that the State of [Tennessee] does not have an adequate inverse condemnation law permitting citizens to recover just compensation for governmental takings,' plaintiff failed to state a claim under the Just Compensation Clause." *Id.* (*quoting Four Seasons Apt. v. City of Mayfield Heights,* 775 F.2d 150, 151–152 (6th Cir. 1985)).

Thus, even if the Court assumes, *arguendo,* the seizure of Lowery's cattle constituted a taking, Lowery's action fails because he makes no claim that Tennessee does not have an adequate inverse condemnation law. Accordingly, the Court will GRANT Defendants' Motion for Summary Judgment with respect to Lowery's § 1983 claim based on a violation of the Fifth Amendment's takings clause.[19]

causal link between the municipal action and the deprivation of federal rights." *Brown,* 520 U.S. 397, 117 S.Ct. at 1388. Lowery has failed to submit any proof of this type. Accordingly, if the Court had found there was a constitutional violation by Faires or Bird, Bradley County still would have been entitled to dismissal.

**19.** *See* footnote 18.

### C. Fourth Amendment—Unreasonable Seizure

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." "To determine whether the [defendants] conducted the seizure in violation of the fourth amendment, [the Court] must examine the facts and circumstances surrounding the [seizure of property]. Such an inquiry does not require a determination of whether there was in fact a need for the [defendants] to [seize the property]; instead we are required to determine whether the [defendants'] decision to [seize the property] was reasonable under the circumstances." *Collins v. Nagle,* 892 F.2d 489, 493 (6th Cir.1989) (citations omitted). "Here, the Fourth Amendment standard of reasonableness requires no more of government officials than that of due process of law." *Flatford v. City of Monroe,* 17 F.3d 162, 170 (6th Cir.1994) (*citing Soldal v. Cook County, Illinois,* 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); and *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)).

The Court finds Defendants' decision to seize Lowery's cattle was reasonable.[20] While Defendants' proceeded without a warrant, Defendants believed they had the authority to act pursuant to *Tenn. Code Ann.* § 39–14–210. Defendants also believed the hazards created by Lowery's wandering cattle created an emergency. Faced with a possible, imminent threat to public safety, the Defendants were forced

**20.** Under *Parratt,* a predeprivation hearing is not required. *See* Section III(A) of this Memorandum. Though *Parratt* only applies to procedural due process claims under the Fourteenth Amendment, if a plaintiff could simply take the same factual circumstance and recharacterize it as a violation of the Fourth Amendment, *Parratt*'s reasoning would be completely circumvented. Thus, the number of cases in which a Court finds

to take immediate action. *See* Section III(A) of this Memorandum. While Lowery may not agree with the action taken, "the fourth amendment reasonableness standard does not turn on the availability of less intrusive alternatives." *Collins,* 892 F.2d at 493 (citations omitted). Accordingly, the Court will **GRANT** Defendants' Motion for Summary Judgment on Lowery's § 1983 claim based on a violation of the Fourth Amendment.[21]

### D. State Law Claims

Because Lowery's federal claim will be dismissed, the Court will not exercise supplemental jurisdiction over the state law claims. "A district court has broad jurisdiction in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1254 (6th Cir.1996). In determining whether to exercise supplemental jurisdiction, courts must consider judicial economy, convenience, fairness, and comity. *Id.* "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id.* at 1254–55.

Lowery has asserted several state law claims against the Defendants. There are also two intervening petitioners asserting other state law causes of action. Consequently, the Court finds judicial economy, convenience, fairness, and comity point to remanding this case to the Circuit Court for Bradley County, Tennessee.

### IV. *CONCLUSION*

Lowery has based his § 1983 claim on violations of the Fourteenth (procedural due process), Fifth (takings), and Fourth (unreasonable seizure) Amendments to the Constitution. Since Lowery has failed to plead and prove the inadequacy of postdeprivation remedies, any claim under the Fourteenth Amendment cannot be sus-

tained. A claim under the Fifth Amendment also cannot be sustained because Lowery makes no claim that Tennessee does not have an adequate inverse condemnation law. With respect to the Fourth Amendment claim, the Court finds the Defendants' conduct was reasonable in light of the circumstances. Thus, a Fourth Amendment claim also could not be sustained. There being no other basis for Lowery's § 1983 cause of action, the Court will **GRANT** Defendants' Motion for Summary Judgment on this claim.

Upon dismissal of Lowery's § 1983 claim, the remaining claims concern only state law issues. In the interest of judicial economy, fairness, and convenience, the Court will **DECLINE** to exercise supplemental jurisdiction over these state claims and will **REMAND** the case to the Circuit Court for Bradley County, Tennessee.

An Order shall enter.

---

*Parratt* applies to a factual circumstance yet also finds the Defendants acted unreasonably under the Fourth Amendment is likely small.

**21.** *See* footnote 18.